# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00766-CV

**General Motors Corporation, Appellant**

**v.**

**Brett Bray, in his Official Capacity as Director of the Motor Vehicle Division of the Texas Department of Transportation; Charles E. Elliott and Eaton Motor Company, Inc., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. D-1-GN-06-001227, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## O P I N I O N

General Motors appeals the trial court's order affirming a final order issued by the Motor Vehicle Division of the Texas Department of Transportation. The Division's final order finds that GM unreasonably denied the request of Eaton Motor Company, Inc. to transfer its Buick, Pontiac, and GMC franchises to Charles E. Elliott, who was a Chevrolet franchise holder, in violation of the occupations code. *See* Tex. Occ. Code Ann. §§ 2301.359, .360, .458 (West 2004). The final order also finds that Elliott is qualified to be a Buick, Pontiac, and GMC dealer, which forces GM to accept the transfer. *See id.* § 2301.360(c). In nine points of error, GM challenges 96 of the 175 findings of fact and four of the five conclusions of law. Because the Division's interpretation of section 2301.359 of the occupations code contradicts the plain language of the

statute, we will reverse portions of the trial court's order and remand certain issues to the Division for further proceedings. We will affirm the remainder of the trial court's order.

## BACKGROUND[1]

For more than 37 years, Hays H. Mills owned and operated a Pontiac, Buick, and GMC dealership in Athens, Texas, known as Eaton Motor Company. Mills, who was 79 years old and in ill health at the time of the administrative hearing, had agreed to transfer his dealership to Charles Elliott, who owned and operated Elliott Chevrolet. Elliott had operated the Chevrolet dealership in Athens since 1985, and throughout the years, Elliott and Mills had been fierce competitors in the Athens market.

Athens, a town with a population around 11,000, is the county seat of Henderson County in rural northeastern Texas. It is approximately 65 miles from Dallas and approximately 35 miles from Tyler. A significant percentage of Athens's residents commute to Dallas and Tyler to work. Beginning in late 2002, Athens suffered an economic downturn because of the loss of two of the city's major employers.

In late 2003, an employee in GM's Dealer Network and Development Division approached Mills and suggested that he sell his dealership to Elliott because GM's long-term plan for Athens was for it to be a one-GM-dealer town where all GM products would be sold under one roof. GM's Zone Manager made the same recommendation to Elliott, urging him to buy the Eaton dealership. GM's Regional Manager for Sales told Mills that if Mills did not procure a buyer before

---

[1] The following recitation of facts comes from the testimony and documentary evidence introduced at the administrative hearing.

his dealership operations ceased, the consequences would be devastating: his heirs might lose around half the value of the dealership.

As a result of the discussions that both Mills and Elliott had with GM, Mills and Elliott entered into negotiations that resulted in the execution of an asset and stock purchase agreement in which Elliott agreed to purchase all the stock of Eaton Motor Company, the dealership building, parts, tools, equipment, and "blue sky" for $1,400,000. This agreement was made contingent on GM's approval of the transfer of the franchises.

On November 24, 2003, Mills applied online for approval by GM to transfer his dealership to Elliott. GM rejected the application on January 5, 2004. One month later, Mills reapplied to GM by certified mail as required by the occupations code. *Id.* § 2301.359(b)(2). GM again rejected the application. In rejecting the application, GM focused on Elliott's failure to achieve satisfactory retail-sales-index (RSI) and consumer-satisfaction-index scores.[2]

The GM policies regarding dealership transfers that were in effect at the time of Mills's application are contained in Dealer Bulletin GM 01-17, which was distributed to all GM dealers. According to the bulletin, a proposed GM dealer should be a person who "[h]as a successful record as a merchandiser of automotive products and services, or has otherwise demonstrated the ability to successfully manage a dealership."

---

[2] During the administrative proceeding, GM withdrew Elliott's consumer-satisfaction-index scores as a basis for denial because Elliott's scores increased to a level satisfactory to GM after the rejection. Thus, GM relied only on Elliott's RSI scores as the basis for its denial in the administrative proceeding, in the trial court, and in this Court.

3

In addition, the bulletin contains requirements for a "Multiple Dealer Operator," which applied to Elliott because a Multiple Dealer Operator is defined by the bulletin as "a person who has, *or is applying to have*, an ownership interest in more than one GM dealership and who is named, *or is applying to be named*, as Dealer Operator in more than one GM dealership." (Emphases added.) One of the requirements for a Multiple Dealer Operator is that "[e]ach GM dealership where a [Multiple Dealer Operator] candidate is Dealer Operator or has any ownership interest must have attained a year-end Retail Sales Index of 100 or higher for all such dealership operations." The bulletin also provides an exception for dealers with RSI scores of at least 85 who either have a "positive sustaining trend" in their RSI scores or provide a business plan describing how they will increase their RSI scores to 100 within two years.

In essence, RSI scores measure dealers' ability to realize their sales opportunities as calculated by GM. A dealer's RSI score is the percentage of his expected sales that he actually makes. Calculating this score involves several steps. First, GM assigns each of its dealers an area of primary responsibility by assigning each census tract to the dealer that is closest to the "centroid" of the tract as calculated by a computer (unless a geographical feature bars access to the dealership by a substantial number of the residents of the census tract). Second, GM formulates a sales expectation for the area of primary responsibility by applying its Texas market share for each type of vehicle (e.g., light-duty trucks or luxury sedans) to the number of vehicles of each type (of any make) registered by consumers in the area of primary responsibility. Third, GM calculates the RSI score by expressing the dealer's sales anywhere in the country as a percentage of expected sales for the area of primary responsibility. An RSI score of 100 is "average," meaning that the GM dealer

4

reached the same level of sales for its market as the composite of all GM dealers did in the Texas market.[3]

Elliott's year-end RSI scores were problematic in that he did not attain a score of 100. Elliott's score for 2003 was 48.7, and his scores for 2002, 2001, and 2000 were 65.7, 74.0, and 66.04, respectively.

In response to GM's rejection of the transfer application, Mills filed a protest with the Division in April 2004, and Elliott moved to intervene. *See id.* § 2301.360(a) ("A dealer whose application is rejected under Section 2301.359 may file a protest with the board. A protest filed under this section is a contested case.").[4] Mills and Elliott asked the Division to find that GM unreasonably denied the transfer application in violation of the occupations code and that Elliott was qualified to be a Pontiac, Buick, and GMC dealer in Athens. *See id.* § 2301.360(b) ("In a protest under this section, the board must determine whether the prospective transferee is qualified. The burden is on the manufacturer or distributor to prove that the prospective transferee is not qualified.").

---

[3] A simplified example may be helpful: Imagine a market in which there are two types of vehicles, cars and trucks; GM's Texas market share for cars is 20%; its Texas market share for trucks is 25%; 1,000 cars are registered in the area of primary responsibility; and 3,200 trucks are registered in the area of primary responsibility. In this situation, the sales expectation for the GM dealer assigned to the area of primary responsibility is 1,000 vehicles—200 cars and 800 trucks. If the GM dealer sells 1,500 vehicles that are registered anywhere in the country, his RSI score is 150; if he sells 1,000 vehicles, his score is 100; if he sells 500 vehicles, his score is 50.

[4] A reference to "the board" that is not related to the adoption of rules is taken as a reference to the director of the Division. *See* Tex. Occ. Code Ann. §§ 2301.002(9), (10), (12), .005(a) (West 2006).

At the protest hearing, the primary dispute between the parties concerned the extent to which RSI scores are affected by market forces that dealers are unable to control and the extent to which RSI scores accurately measure dealer effort and ability.

Mills and Elliott attempted to show that Elliott's low RSI scores were caused by external market forces that Elliott had no control over. Their expert testified that there are many more Athens residents who commute to Tyler and Dallas for work than there are residents of other cities who commute to Athens for work. The expert testified that Dallas and Tyler are both higher than Athens in the "hierarchy of cities," that those cities therefore have Chevrolet dealers with larger and more varied selections than Elliott Chevrolet, and that people are more likely to buy vehicles from dealers with larger inventories, especially if the dealerships are in or on the way to the cities in which those people work. The expert thus claimed that Elliott was losing sales to Chevrolet dealers in Tyler and Dallas through no fault of his own.

GM attempted to show that Elliott's RSI scores were the result of his poor performance as a dealer. Its expert testified that the RSI formula takes account of many of the market forces identified by Mills and Elliott. The expert also pointed to specific Chevrolet dealerships that operated under what the expert considered similar conditions to Elliott Chevrolet that had attained RSI scores over 100.

This debate was germane to the two issues in the case before the agency—whether Elliott is qualified and whether GM unreasonably denied the transfer application. According to the occupations code, the key issue for the Division to determine in a protest action is "whether the prospective transferee is qualified." *Id.* But because Mills and Elliott requested a finding that GM

6

violated the occupations code along with its protest action, considerable time was spent in the administrative hearing on whether GM unreasonably denied the transfer application in violation of section 2301.359 of the occupations code. That section provides,

> A manufacturer or distributor may not unreasonably withhold approval of an application [for transfer of a dealership]. It is unreasonable for a manufacturer or distributor to reject a prospective transferee who is of good moral character and who meets the written, reasonable, and uniformly applied standards or qualifications, if any, of the manufacturer and distributor relating to the prospective transferee's business experience and financial qualifications.

*Id.* § 2301.359(e).

The Division interprets this statute as providing that a manufacturer may only reasonably deny a transfer application on the basis of the applicant's unacceptable moral character or the applicant's failure to meet written, reasonable, and uniformly applied standards relating to the prospective transferee's business experience or financial qualifications.

Based on this interpretation, the Division held that GM unreasonably denied the transfer application in violation of section 2301.359 by using unwritten standards. The Division held that the dealer bulletin's requirement that a prospective transferee who is a current GM dealer "must have attained a year-end Retail Sales Index of 100" for each GM dealership did not provide notice to dealers that their applications would be rejected if they had not attained year-end RSI scores of 100 or higher. The Division also held that GM violated the statute because the fact that it reviews RSI scores for the previous three years was unwritten. Further, the Division found that GM assigns unwritten weights to certain criteria enumerated in the dealer bulletin.[5]

---

[5] The administrative law judge recommended assessing a civil penalty against GM, but that recommendation was not followed in the final order.

7

The Division also found that Elliott is qualified, which forced GM to accept the transfer. *See id.* § 2301.360(c) ("If the board's order is that the prospective transferee is qualified, the dealer's franchise is amended to reflect the change in franchisee, and the manufacturer or distributor shall accept the transfer for all purposes.").

GM sought judicial review of the Division's decision in district court. *See id.* § 2301.751(a), (c) (West 2004) ("A party to a proceeding affected by a final order, rule, or decision or other final action of the board or director under this chapter . . . may seek judicial review of the action," which is conducted "in the manner provided by Chapter 2001, Government Code."). The district court affirmed the Division's final order in all respects.

GM appeals to this Court, arguing that the Division incorrectly interpreted section 2301.359 and challenging almost all the findings of fact, as well as the Division's conclusions that GM violated the statute and that Elliott is qualified.

## DISCUSSION

**Standard of Review**

Our analysis will be conducted under the following standard of review:

[A] court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

8

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174 (West 2000).

Substantial-evidence review is a limited standard of review requiring only more than a mere scintilla to support an agency's determination. *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 566 (Tex. 2000) (citing *Railroad Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792–93 (Tex. 1995)). More than a scintilla of evidence to support a finding exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions concerning the finding. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). Whether substantial evidence supports an administrative finding is a question of law. *Davis*, 34 S.W.3d at 556.

An agency decision is arbitrary when its final order denies parties due process of law or fails to demonstrate a connection between the agency decision and the factors that are made relevant to that decision by the applicable statutes and regulations. *Occidental Permian Ltd. v. Railroad Comm'n of Tex.*, 47 S.W.3d 801, 806 (Tex. App.—Austin 2001, no pet.). A court reviewing a decision for arbitrariness should consider all relevant factors and may not substitute its judgment for that of the agency. *Id.* An agency abuses its discretion if it acts without reference to

9

guiding rules or principles. *See City of Amarillo v. Railroad Comm'n of Tex.*, 894 S.W.2d 491, 495 (Tex. App.—Austin 1995, writ denied).

**Statutory-Construction Points**

In points of error one, two, five, and six, GM argues that the Division incorrectly interpreted section 2301.359 of the occupations code as providing that a manufacturer may only reasonably deny a transfer application based on the applicant's unacceptable moral character or the applicant's failure to meet the manufacturer's written, reasonable, and uniformly applied standards relating to business experience or financial qualifications. The interpretation of section 2301.359 is a question of first impression. GM also challenges 88 findings of fact and four conclusions of law that are allegedly tainted by the statutory-construction error.

### *Construction of Section 2301.359*

The parties have two disparate interpretations of section 2301.359 of the occupations code. The dispute centers on the relationship between the two sentences in subsection (e). The first sentence of subsection (e) provides that a manufacturer "may not unreasonably withhold approval" of a transfer application. Tex. Occ. Code Ann. § 2301.359(e). The second sentence states that "[i]t is unreasonable for a manufacturer or distributor to reject a prospective transferee who is of good moral character and who meets the written, reasonable, and uniformly applied standards or qualifications, if any, of the manufacturer or distributor relating to the prospective transferee's business experience and financial qualifications." *Id.*

The Division believes that the second sentence, which explicitly refers only to an *unreasonable* denial, sets out all the ways that a manufacturer may *reasonably* reject a transfer

applicant. The Division urges that a manufacturer may only reasonably deny a transfer based on the moral character of the applicant or the applicant's failure to meet the manufacturer's written, reasonable, and uniformly applied standards or qualifications relating to the applicant's business experience or financial qualifications. The Division addresses the "if any" language in the second sentence by claiming that a manufacturer without written, reasonable, and uniformly applied standards relating to business experience or financial qualifications may not reasonably reject any applicant of good moral character.

GM, on the other hand, argues that the second sentence simply describes one situation in which a manufacturer's rejection of a transfer applicant would be unreasonable per se. It urges that the "if any" language reflects the legislature's understanding that not all manufacturers and distributors have written, reasonable, and uniformly applied standards for transfer applicants relating to business experience and financial qualifications.

In determining the meaning of a statute, we are guided by certain well-settled principles of statutory construction. First and foremost, we must follow the plain language of the statute. *Hunter Indus. Facilities v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 96, 102 (Tex. App.—Austin 1995, writ denied). If a statute is clear and unambiguous, it should be given its commonly understood meaning without resort to extrinsic aids of statutory construction. *Id.* If a statute is ambiguous, however, extrinsic aids, such as the interpretation of the agency charged with the statute's enforcement, may be used to determine legislative intent. *Id.*

Further, we must presume that every word in the statute is "intended to be effective," *see* Tex. Gov't Code Ann. § 311.021(2) (West 2005), yet we must also recognize what language is not included in the statute. The second sentence of the statute does not explicitly address situations

11

where a transfer application is denied because the applicant (1) does not have good moral character, (2) does not meet standards relating to business experience or financial qualifications that are not written, reasonable, or uniformly applied, (3) does not meet written, reasonable, and uniformly applied standards that do not relate to business experience or financial qualifications, or even (4) does not meet written, reasonable, and uniformly applied standards that relate to business experience or financial qualifications. Because the second sentence leaves many situations unaddressed, we cannot accept the Division's argument that it is intended to be comprehensive.

Here, the plain and unambiguous language of section 2301.359 contradicts the Division's interpretation. We agree with GM that the legislature's "if any" language recognizes that manufacturers may not have written, reasonable, and uniformly applied standards relating to business experience and financial qualifications. Moreover, nothing in the statute requires manufacturers to have such standards in order to reasonably deny a transfer applicant with good moral character.

While we agree with GM's primary interpretation of the statute, we reject its assertion that the second sentence simply provides a bright-line test for one specific factual situation. While it does do that, the second sentence also provides guidance concerning the interpretation of the comprehensive standard set out in the first sentence—reasonableness. Thus, a manufacturer who rejects a transfer applicant because of the applicant's unacceptable moral character has a better argument with respect to the reasonableness of its denial than does a manufacturer who rejects an applicant based on unwritten, unreasonable, and disparately applied standards that do not relate to business experience or financial qualifications.

Because of the general principle that courts may not reweigh evidence and substitute their judgment for that of administrative agencies, courts should generally remand to agencies when

12

they find errors of law. *See Texas Dep't of Transp. v. T. Brown Constructors, Inc.*, 947 S.W.2d 655, 659–60 (Tex. App.—Austin 1997, pet. denied). Determinations of reasonableness are usually questions for fact-finders. *Adam Dante Corp. v. Sharpe*, 483 S.W.2d 452, 456 (Tex. 1972); *Southwest Guar. Trust Co. v. Providence Trust Co.*, 970 S.W.2d 777, 783 (Tex. App.—Austin 1998, pet. denied). Accordingly, we reverse the portions of the trial court's order that affirm the Division's conclusions that GM unreasonably denied the transfer application and remand the case to the Division for it to determine whether GM unreasonably denied the transfer application using the construction of the statute that we have set forth above.[6]

While our remand obviates the need to address many of the findings of fact that GM challenges because those findings appear to have been tainted by the statutory-construction error, some of the challenged findings still merit discussion.

### *Challenged Findings of Fact*

Clearly, our holding with respect to the construction of section 2301.359 requires us to sustain GM's challenges to the following "findings of fact," which actually contain legal conclusions, because they are affected by an error of law that prejudiced GM's substantial rights:

> 102. Use of such unidentified factors and judgment comprise unwritten standards, which make them a material violation of Code § 2301.359(e).
>
> . . . .

---

[6] During oral argument, the parties revealed for the first time that Elliott has sold the dealership in question to a third party who was approved by GM. Obviously, the Division's decision to make further rulings may depend on the parties' contentions concerning mootness, an issue that has not been briefed in this Court.

13

107. GM's assignment of the weight assessed to each factor on a transfer application is an unwritten criterion, which makes the standard a material violation of Code § 2301.359(e).

. . . .

111. Basing a denial upon unwritten standards and qualifications is a material violation of Code § 2301.359(e).

As explained above, basing a denial of a transfer application on unwritten standards is not a per se violation of section 2301.359, although the Division may consider whether the standards were written as one factor in analyzing whether the denial was reasonable.

We also sustain GM's challenges to the following findings of fact because they are unsupported by any record evidence and prejudiced GM's substantial rights:

110. Because GM based its denial on unwritten standards and qualifications, the applicant and prospective transferee lacked fair notice of the qualifications and standards that the manufacturer would apply to the pending transfer.

. . . .

175. GM based its decision to reject Eaton's dealership transfer application on unwritten standards and qualifications relating to business experience.

GM's requirement that "[e]ach GM dealership where a [Multiple Dealer Operator] candidate is Dealer Operator or has any ownership interest must have attained a year-end Retail Sales Index of 100 or higher for all such dealership operations" was clearly written into its dealer bulletin in the section concerning Multiple Dealer Operators. The use of the word "must" gave fair notice that prospective transferees who had not met this level of sales effectiveness would be denied. Although the Division found that GM's policy of reviewing a dealer's RSI scores for the previous

14

three years was unwritten, this policy did not affect Elliott—whether GM reviewed only the current year, one prior year, three prior years, or all the years that Elliott owned the dealership, Elliott would have fallen far short of the requirement that his RSI scores be at or above 100.

The Division also found that GM placed unwritten weights on certain factors. However, this weighting process was never applied to Elliott. GM's Dealer Organization Manager for the South Central Region, William Siegrist, testified at the administrative hearing that prospective transferees who are multiple dealer operators must meet minimum requirements in four areas—sales effectiveness, customer satisfaction, profitability, and capitalization—and that a dealer who did not meet the minimum requirement in any of the four areas would be rejected unless an exception applied. Siegrist also testified that if a dealer met the minimum standards in each of the four areas, he would also have to meet a composite minimum in which sales effectiveness is weighted 50%, customer satisfaction is weighted 30%, and profitability and capitalization are each weighted 10%. The weighting process was never applied to Elliott because he did not meet the minimum requirement for sales effectiveness and did not qualify for an exception.

The Division also found that GM used unwritten standards because the dealer bulletin states that GM will use its "business judgment" in evaluating transfer applications and because the bulletin asserts that it is impossible to catalogue every relevant factor and make a comprehensive list. However, all the testimony indicated that no "business judgment" was used in evaluating Elliott because he fell far short of the RSI requirement and did not qualify for an exception. Thus, GM did not base its denial of the transfer application on unwritten standards. The requirement that a prospective transferee "must" have RSI scores over 100 was clearly written into the dealer bulletin,

15

and all the evidence adduced at the administrative hearing indicated that this was the sole basis on which GM relied to deny the transfer application.

We reject GM's challenges to the following findings of fact as without merit because the findings are supported by substantial evidence, as described in more detail below: 12, 13, 14, 15, 18, 19, 20, 37, 38, 41, 42, 43, 44, 55, 60, 61, 62, 63, 64, 66, 67, 68, 69, 99, 100, 101, 104, 109, 113, 116, 117, 118, 119, 120, 121, 122, 123, 125, 126, 127, 128, 129, 130, 131, 133, 134, 135, 136, 137, 139, 140, 141, 142, 143, 146, 147, 148, 149, 150, 152, 153, 154, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, and 167.

The following findings of fact are supported by Mills's undisputed testimony:[7]

12.  It was GM's long-term goal to change the channeling strategy in Athens in an effort to eliminate the intra-brand competition between Chevrolet, GMC, Pontiac and Buick.

13.  GM would put all products in one dealership with the new channeling strategy.

14.  During his visit to the Eaton dealership in late 2003, Mr. Bufstetter told Mr. Mills that the ideal situation would be for Mr. Elliott, the owner of the Chevrolet franchise in Athens, to buy Mr. Mills' Pontiac/Buick/GMC dealership.

. . . .

18.  GM rejected the request for Scott Mills to become the successor operator.

19.  Scott Mills was involved in a serious motorcycle accident in 1999, which left him blind.

20.  Larry Hice, GM Regional Manager for Sales, told Mr. Mills that if his dealership operations ceased without selling it, then his wife and son might lose at least half of the value of his business.

---

[7]  Many of these findings are also supported by additional evidence.

The following findings are supported by Elliott's undisputed testimony:[8]

15.  Tom Craig, the former GM Zone Manager for Athens, urged Mr. Elliott to buy the Eaton dealership.

. . . .

120.  The Athens Ford dealer went out of business because he over built his dealership and sold vehicles too cheaply in order to achieve volume.

. . . .

123.  Most Dodge and Ford vehicles are less expensive than comparable Chevrolet vehicles.

. . . .

125.  Since 2002, Athens lost several of its major employers and approximately 1,200 of its highest paying jobs due to a downturn in the local economy.

. . . .

141.  Elliott Chevrolet maintains an inventory of 90 to 130 Chevrolet vehicles.

. . . .

146.  GMAC requires the dealer's inventory to be consistent with capitalization.

147.  Even if a dealer wanted to maintain a higher inventory, GMAC will not allow the dealer to go above his travel rate.

. . . .

149.  Elliott Chevrolet's reputation for quality service is well known.

150.  GM representatives often send vehicles that other dealers have been unable to repair to Elliott Chevrolet for service.

. . . .

---

[8]  Many of these findings are also supported by additional evidence.

157. The transfer of Elliott Chevrolet from GM's Tyler Zone to the Dallas Zone caused a competitive hardship.

158. GM does not advertise the Chevrolet brand in the Athens [area of primary responsibility] but does do brand advertising in the Dallas [area of primary responsibility].

159. Once Elliott was transferred into the Dallas Zone, Dallas co-op advertising required Elliott to be charged a $400 fee per unit purchased from GM.

160. This left Elliott Chevrolet with a $400 competitive disadvantage in price to his local competitors in the Tyler Zone who do not pay this co-op fee.

161. Elliott Chevrolet withdrew from the Dallas co-op advertising and purchased six billboards at a 50% increase in previous advertising expenditures.

162. Elliott Chevrolet has undertaken substantial efforts to improve its sales performance by focusing advertising expenditures specifically on the Athens market.

163. Mr. Elliott took finance course work at the University of Texas but he did not earn a degree.

164. Financial circumstances caused Mr. Elliott to withdraw from college.

165. Mr. Elliott worked for thirteen years in the used car business in Brownsborough, Texas where he owned three used retail car operations.

166. In 1985, Mr. Elliott purchased Godwin Chevrolet in Athens, Texas.

167. Mr. Elliott subsequently changed the dealership name to Elliott Chevrolet and he has been the dealer operator of a profitable Chevrolet dealership for approximately 20 years.

The following finding is supported by the undisputed testimony of Elliott's wife Alicea, who helped him run Elliott Chevrolet:

121. In an effort to improve sales, Elliott Chevrolet has reduced profitability on new vehicles by operating the new vehicle department in the red.

The following findings are supported by the undisputed testimony of William Siegrist, GM's Dealer Organization Manager for the South Central Region:[9]

37. The committee [that made the decision concerning the transfer application] also discussed other considerations, such as the dealer network plan, line-make alignment, and Elliot [sic] Chevrolet's declining trend in sales performance over the last few years.

38. The action committee was made aware of the long-term plan to make Athens, Texas a one GM dealer town, which Elliott's purchase of the Eaton dealership would accomplish.

. . . .

41. Some of GM's employees who were making recommendations about the approval or denial of the transfer application were unfamiliar with Athens, Texas and Elliott Chevrolet.

42. Keith Best was a new zone manager for Dallas and the surrounding areas.

43. Larry Hice, GM Regional Manager, knew little about the Athens market and Elliott's dealership, yet made a recommendation to deny the transfer application.

44. The action committee did not solicit a recommendation from Tom Craig, the former zone manager who was familiar with the Athens, Texas market and who first recommended the sale of Eaton's dealership to Elliott to accomplish GM's channeling strategy.

. . . .

104. GM assigns weight to each of these factors on a transfer application based on an unwritten policy with RSI accounting for 50%, CSI 30%, capital 10% and profitability 10%.

. . . .

113. The GM action committee was unaware of the economic downturn because they relied upon Mr. Best, who was new to Athens, and Mr. Hice, who is unfamiliar with Athens, to issue recommendations about Elliott Chevrolet's market.

---

[9] Many of these findings are also supported by additional evidence.

. . . .

140. Travel rate is the volume of new vehicle sales that a dealer makes within any particular period of time.

. . . .

148. No operational analysis of the dealership was performed by the manufacturer to verify its assumption that Elliott Chevrolet's sales performance decline was based on an operational problem.

The following findings are supported by (and often taken directly from) GM's dealer bulletin, which was entered into evidence at the administrative hearing:

55. GM's qualifications and standards as to business experience for a dealer transfer applicant are set forth in the Dealer Bulletin GM 01-17 Section I. B. "Personal Background and Experience," and apply to all proposed ownership changes.

. . . .

60. GM's [sic] evaluates a dealer transfer application by considering and weighing many factors, which are not all identified in the bulletin.

61. GM varies the weight and importance of these factors depending upon many issues, which include but are not limited to, the size and expense structure of the dealership opportunity under review.

62. GM also evaluates a dealer transfer application by recognizing that the manufacturer does not anticipate every issue that may arise in connection with the review of proposed changes, and factors other than those contained in the bulletin may have a substantial impact on the outcome of GM's review of a proposal.

63. GM has no precise formula or abstract calculation that is used to make all determinations, and the application of business judgment is essential to GM.

64. GM requires the following for the business experience and educational background of all dealer applicants: (1) competent in business; (2) effective manager; (3) caring attitude toward customers; (4) successful record as a merchandiser of automotive products and services, or has otherwise demonstrated the ability to successfully manage a dealership.

20

. . . .

66. GM failed to meet its burden of proof to establish by credible evidence that Mr. Elliott lacks the business experience and educational background required by GM in its Dealer Bulletin GM 01-17 Section I. B.[10]

67. Sales performance standards are not required under GM's background and experience standards.

68. GM does consider prompt and effective sales and service and effective sales performance as an "other consideration" for a dealer transfer application.

69. GM's written standards for the business experience of all dealer candidates do not specifically address a particular level of sales performance.

. . . .

99. GM uses unidentified factors that are not contained in GM's written standards that have a substantial impact on its decisions regarding dealer transfer applications.

100. GM uses unidentified business judgment that is not contained in GM's written standards to make its decisions regarding dealer transfer applications.

101. Business judgment is subjective and will vary from person to person and application to application.

. . . .

109. The manufacturer's three year review for sales data to calculate the dealer's RSI is an unwritten standard and qualification.


The following findings are supported by the testimony of Mills and Elliott's expert,

Ernest Harry Manuel, Jr.:

---

[10] The contents of this section of the bulletin are supported by the bulletin. The fact that GM failed to show that Elliott did not meet the standards in this section of the bulletin is supported by other evidence, including the testimony of Elliott and GM employees.

116.  The hierarchy of cities is a concept that recognizes that there are major hub cities, such as Dallas and Houston, which allow economies of scale to increase specialization in products and services.

117.  The hierarchy also includes regional hub cities like Tyler, Texas, which does not have as many specialized products and services as Dallas, but it has more than Athens, Texas.

118.  Major hub cities and regional hub cities bring in shoppers from the smaller towns and rural areas.

119.  Elliott Chevrolet is in direct competition with dealers in Tyler and Dallas where inventory and prices are better than in Athens because of the size of the markets.

. . . .

122.  Elliott Chevrolet cannot operate its new vehicle business at a loss for long or the dealership may also go out of business.

. . . .

126.  Athens residents have accelerated their long-standing tendency to commute to work in nearby towns and cities such as Mabank, Tyler, and Dallas.

127.  The term commutation is a general word for commuting, which means patterns of journeys from home to work.

128.  Out-commutation is a pattern where there is a high level of commutation out of a county as compared to into a county.

129.  Almost half of the employed population of Henderson County residents work in another county.

130.  Approximately 13,000 people are leaving Henderson County to commute to work and approximately 3,000 are commuting into Henderson County for work.

131. Residents of Henderson County commute most frequently to Dallas County and Smith County for employment.

. . . .

133.  Elliott's sales volume is hindered when Henderson County natives commute to other counties for employment and pass by other competing dealerships that have larger inventories due to their market size.

134.  The economic conditions in Athens have declined since 1999 making it increasingly difficult for the Elliott dealership to maintain sales performance standards.

135.  Employment in Henderson County has declined and there has been an increase in workers commuting out of the county leaving plenty of opportunity to shop in neighboring cities and towns.

136.  A $15,000 - $65,000 median annual income range is too vast to reasonably draw a conclusion that any particular percentage of Athens residents can afford a new Chevrolet.

137.  It is unreasonable to conclude that a family with a median household income of $15,000 is in the market for a new Chevrolet vehicle.

. . . .

139.  A dealer must maintain an inventory that is commensurate with the dealer's travel rate.

. . . .

142.  Eaton maintains an inventory of 35 vehicles for all three lines, Buick, GMC and Pontiac.

143.  King Chevrolet, 35 miles away in Tyler, Texas, maintains an inventory up to five or six times larger than Elliott Chevrolet.

. . . .

152.  A large market dealer generally sells higher volume than a small market dealer and so the large market dealer then tends to earn allocation of short supply, high demand vehicles, faster than the small market dealer.

153.  If the small market dealer doesn't get the product while it is still in high demand, then he's at a competitive disadvantage to others who obtain the product more quickly and in higher volume.

23

The following findings are supported by the testimony of GM's expert, Sharif Farhat:

154. GM's market share has declined from approximately 60% in the 1960's to approximately 27% in 2004.

. . . .

156. GM's decline in market share contributes to a dealer's sales performance.

*Qualification Issue*

We now turn to GM's arguments concerning the Division's finding that Elliott is qualified. *See* Tex. Occ. Code Ann. § 2301.360(b) ("In a protest under this section, the board must determine whether the prospective transferee is qualified. The burden is on the manufacturer or distributor to prove that the prospective transferee is not qualified."). The Division found that Elliott is qualified, reasoning that GM failed to meet its burden to prove that Elliott is not qualified. GM argues that it did meet its burden.

We hold that the conclusion is supported by substantial evidence and is not arbitrary, capricious, or an abuse of discretion. The inquiry by the Division concerning whether a dealer is qualified is different than the inquiry by a manufacturer concerning whether a prospective transferee is acceptable to it. Under section 2301.359, GM is given the power to reject any prospective transferee whom it determines is "not acceptable," limited only by the requirement that it "not unreasonably withhold approval." *Id.* § 2301.359(d), (e). Each manufacturer may have standards that are appropriate to advance its business interests—GM, Ford, and Toyota are not likely to have identical business plans.

But if a dealer whose application is rejected files a protest, the Division becomes the decisionmaker that must decide whether the dealer is "qualified." *Id.* § 2301.360(b). The Division is charged with enforcement of chapter 2301, *id.* § 2301.101, whose purposes include "exercise of the state's police power to ensure a sound system of distributing and selling motor vehicles," which "vitally affects the general economy of the state and the public interest and welfare of its citizens." *Id.* § 2301.001. The question whether GM unreasonably withheld approval of a transfer applicant that it found "not acceptable," *see id.* § 2301.359(e), is a different question than whether to uphold the Division's finding, made in the context of concern for the public interest and the welfare of Texas citizens, that a dealer is qualified.[11] *See id.* §§ 2301.001, .360(b).

The Division's conclusion that Elliott is qualified is supported by the following facts: Elliott worked in the used-car business for 13 years; Elliott has run his Chevrolet dealership profitably for 20 years; Elliott Chevrolet is well known for having a superior service department; Elliott Chevrolet has been taking steps to increase its sales effectiveness; and Elliott took finance courses at the University of Texas.

We reject GM's challenge to Finding of Fact 168, which states, "GM failed to establish its burden of proof to show that Mr. Elliott is not qualified by his business experience to be a Pontiac/Buick/GMC dealer." We also reject GM's challenges to the following conclusions of

[11] In the context of reviewing whether a manufacturer has shown good cause to terminate a dealer's franchise, the Division takes factors into account that manufacturers may not, such as "injury or benefit to the public" and "whether warranties are being honored by the dealer." Tex. Occ. Code Ann. § 2301.455 (West 2004). Similar considerations may guide the Division's analysis concerning whether prospective transferees are qualified, but manufacturers do not necessarily act unreasonably by ignoring factors that are important to the Division.

25

law to the extent that they conclude that GM failed to meet its burden of proof with respect to Elliott's being qualified:

> 3. Respondent, General Motors Corporation, failed to establish that the prospective transferee, Charles E. Elliott, was not qualified, in violation of Code §§ 2301.359 and 2301.360.
>
> . . . .
>
> 5. General Motors Corporation failed to establish its burden of proof to show that Charles E. Elliott was not qualified as to moral character, business experience and financial qualifications, in violation of Code §§ 2301.359 and 2301.360.

To the extent that these conclusions confuse the inquiry whether Elliott is qualified with the inquiry whether GM unreasonably denied the transfer application and find that GM violated section 2301.359, we sustain GM's challenges. We have remanded that issue to the Division for further consideration under the construction of section 2301.359 that we have announced. To the extent that the Division found that GM violated section 2301.360 by failing to meet the burden of proof assigned by that section, we also sustain GM's challenges. A statute assigning a burden of proof is not violated by a party who tries but fails to meet that burden. Just as a litigant in a trial court who files a summary-judgment motion does not violate the rules of civil procedure if the trial judge decides that the party is not entitled to judgment as a matter of law, GM did not violate section 2301.360 by failing to meet the burden of proof assigned by that section.

**Substantial-Evidence Points**

In points of error three, seven, eight, and nine,[12] GM challenges eight findings of fact not challenged under the statutory-construction points, arguing that they are not supported by substantial evidence and that five of them are irrelevant to the conclusions of law.

We sustain GM's challenge to Finding of Fact 180, which states, "The potential harm to the public is great due to GM's unlawful rejection of Eaton's dealer transfer application." We have reversed the finding that GM violated the occupations code and remanded this issue for further proceedings.

We hold that Finding of Fact 179, which states, "Code § 2301.801(a) allows for a penalty amount not to exceed $10,000 for each violation, with each day of violation considered as a separate violation," is supported by substantial evidence. Finding 179 is simply a correct statement of the law. Although it is irrelevant to the final order's conclusions of law because the Division rejected the recommended civil penalty, GM's substantial rights were not prejudiced.

We also hold that Finding of Fact 181, which states, "The motoring public of the Athens, Texas area relies upon the Eaton dealership for sales and service," is supported by substantial evidence. We hold that Finding of Fact 182, which states, "Preventing Eaton from transferring its dealership in accordance with state law may leave the motoring public without a Pontiac/Buick/GMC dealer in the Athens, Texas area for sales and service," is also supported by substantial evidence.

---

[12] Point of error four is inadequately briefed—there is only a one-sentence heading. *See* Tex. R. App. P. 38.1(h). We thus decline to address it. *See Batto v. Gafford*, 119 S.W.3d 346, 350 (Tex. App.—Waco 2003, no pet.).

We hold that the following three findings of fact are not supported by substantial evidence but did not prejudice GM's substantial rights:

94. Only 50% of current Texas Chevrolet dealers are eligible candidates for a dealership transfer.

. . . .

170. GM's process for calculating the RSI keeps 50% of all current Texas Chevrolet dealers with an RSI of below 100.

171. GM's process for calculating the RSI makes 50% of all current Texas Chevrolet dealers ineligible for the appointment of a dealership transfer and keeps them out of compliance with their dealer agreement.

Finding 170 is not supported by substantial evidence because all the evidence on this issue indicated that *approximately* 50% of dealers will always have RSI scores below 100. GM's substantial rights were not prejudiced by this minor deviation. Findings 94 and 171 are not supported by substantial evidence for the same reason and also because no evidence was introduced concerning how many dealers who have RSI scores under 100 would qualify for GM's exception to this requirement. GM's substantial rights were not prejudiced because 50% is still a reasonably accurate estimate.

We hold that Finding of Fact 183, which states, "The absence of a Pontiac/Buick/GMC dealer in the Athens, Texas area would cause economic damage to the public," even if not supported by substantial evidence, did not prejudice GM's substantial rights. No civil penalty was assessed on this basis against GM.

## CONCLUSION

We hold that the Division erroneously construed section 2301.359 of the occupations code. We reverse the portions of the trial court's order that upheld Conclusions of Law 2 and 4 in

28

their entirety, Conclusions of Law 3 and 5 to the extent that they find that GM violated the occupations code, and Findings of Fact 102, 107, 110, 111, 175, and 180. We remand the case to the Division for a determination concerning whether GM unreasonably denied the transfer application in violation of the occupations code using the construction of section 2301.359 that we have announced. The Division should also consider to what extent this dispute has been rendered moot by Elliott's GM-approved sale of the dealership to a third party. We affirm the trial court's order in all other respects.

_____

Diane Henson, Justice

Before Chief Justice Law, Justices Puryear and Henson

Affirmed in part; Reversed and Remanded in part

Filed: August 16, 2007