# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00772-CV

**Gulf Chemical and Metallurgical Corporation, Appellant**

**v.**

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and
Ken Paxton, Attorney General of the State of Texas, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. D-1-GN-11-003174, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## O P I N I O N

Gulf Chemical and Metallurgical Corporation brought suit under Texas Tax Code Chapters 112 and 171 to recover $1,357,920 in franchise taxes that it paid for tax years 2005, 2006, and 2007. After the parties agreed to an order bifurcating the non-jury trial, the trial court tried the issue of whether the methodology that Gulf sought to use in calculating its franchise tax apportionment factor for the years at issue was proper. The trial court found that Gulf's methodology was not proper and entered a final judgment concluding that Gulf was not entitled to any refund. Gulf appeals. We will reverse the trial court's judgment and remand this cause for further proceedings to determine the amount of refund to which Gulf is entitled.

## BACKGROUND

Gulf performs environmental disposal and recycling services for oil refineries by processing their spent fuel catalyst, recovering the precious metals contained therein, and selling the

metals at a profit. According to the deposition of Gulf's controller, Jeffrey Masters, Gulf charges a "service payment" or "environmental fee" to each refinery customer and, as part of the same transaction, provides the customer with a discount in the form of a "metal purchase payment" or "metals credit," which functions as a form of profit-sharing from the metal sales with the customer. Masters explained that even though the two amounts are identified separately on invoices, Gulf considers them as comprising one transaction, and the amounts are "netted" together in determining whether the customer owes Gulf or Gulf owes the customer, depending on the quantity and value of the metals contained in each receipt of spent catalyst.

Masters testified that the "whole purpose" of Gulf's business is to extract and sell the precious metals from the spent catalyst and that without the metal extraction and sale, its "environmental reclamation services" would be "a losing proposition." He referred to Gulf's acquiring the spent catalyst as a "purchase" from the refineries and noted that Gulf's general ledger tracks the service payments and metals credits separately for internal "management reporting purposes" and "tracking costs."[1] Despite these separately tracked "trial balance" accounts, Masters testified that there is a difference between "management reporting" and "financial reporting." Management reporting, he explained, is used for internal purposes, while financial reporting must comply with generally accepted accounting principles (GAAP) and is used for federal and external reporting. Masters testified that under GAAP the service payments and metals credits should be "netted" together to determine Gulf's gross revenue.

---

[1] The service payments are tracked as "Environmental Income" in account #7000010, while the metals credits are tracked as "Environmental Expenses" in account #7120010. For each tax year at issue, the total of "Environmental Expenses" exceeded the total of "Environmental Income."

2

Several contracts between Gulf and its customers were submitted as joint exhibits at trial. One contract representative of those in effect for the years at issue specified that Gulf's customer would pay it a "treatment charge of US $[redacted amount] per ton [of spent catalyst] less metal credits based on the 'As Received Weight' of the spent catalyst." Gulf agreed to "apply a credit for content of primary metals contained in the spent catalyst" and that the "metals credit shall be credited [to customer] to offset the treatment charge."[2] The contract further specified that Gulf would submit "one invoice to [customer] by the 15th of every month along with a statement showing . . . quantity of spent catalyst processed, metals credits, processing fee, [and] net fee owing by [customer] or payment to [customer]."

Also admitted as joint exhibits were reports of independent auditors reviewing Gulf's financial statements for each of the three tax years. Under a heading entitled "Revenue Recognition," these reports represented that Gulf "records environmental sales revenue, net of estimated metals credits, when the spent catalyst has been delivered to [Gulf]'s plant" and that "[f]or those sales under specified customer agreements, which have variable contingent pricing components, net revenue, if any, related to the variable contingent component is not recognized until such time as the price is fixed and determinable."

Gulf's expert witness, CPA Lester Sprouse, testified that GAAP governs corporations using the accrual method of accounting, which method is appropriate for Gulf's type of business

---

[2] This contract was admitted as joint trial exhibit no. 22, entitled "Services Agreement #4600001907," executed by Husky Oil Operations, Ltd. and Gulf on January 1, 2005.

and which method Gulf used during the tax years at issue.[3] He also testified that the "metals credits" Gulf provides to its refinery customers must be considered "allowances" or "sales incentives" under GAAP because they operate as "contra-revenue" to reduce gross receipts. In other words, as a corporation using the accrual method and subject to GAAP, Gulf should net the metals credits with the service payments in determining gross revenue rather than consider the sum total of the service payments as gross revenue.

In reviewing Gulf's federal income tax returns for the three years, Sprouse identified a non-material, "presentation" error in which Gulf erroneously included the metals credits on line 2 of its form 1120[4] as "cost of goods sold" rather than as an "allowance" on line 1, which would have reduced its "gross receipts" entered on line 1.[5] Sprouse averred that not only would it have been "appropriate" for Gulf to have deducted the metals credits before determining gross revenue, but because Gulf was using the accrual method and following GAAP, the metals credits "should have been netted in [Gulf's] gross receipts" on line 1. However, Sprouse testified that the way a corporation "presents" its gross receipts on form 1120, even if erroneous, does not "change" the accounting method it uses in its business or affect GAAP's treatment of allowances. With respect to this particular error, Sprouse noted that there was no need or incentive for Gulf to amend its federal tax returns because there would have been no difference in its ultimate tax liability (because

---

[3] On its federal income tax returns for the three years at issue, Gulf "checked the box" for the accrual method of accounting.

[4] Form 1120 is the standard federal income tax return form for corporations.

[5] Line 1 on form 1120 requires the entry of (a) "Gross receipts or sales," (b) "Less returns and allowances," (which space Gulf left blank) for a total (c) "Bal[ance]."

4

the metals credits were deducted elsewhere from taxable income) and, therefore, "no reason" to amend; amendment would merely constitute an added expense.

The trial court also admitted as a joint exhibit an abstract issued by the Emerging Issues Task Force (EITF) which, according to Sprouse, is a subcommittee of the American Institute of Certified Public Accountants and Financial Accounting Standards Board. Sprouse explained that this abstract, known as EITF 01-09, became effective in 2002. *See* Emerging Issues Task Force Issue No. 01-09, *Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)* (abstract), ¶9. EITF 01-09 specifies that its purpose is to "codify and reconcile [certain issues addressing] the accounting for consideration given by a vendor to a customer." It further states that "cash consideration (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, should be characterized as a reduction of revenue when recognized in the vendor's income statement." Sprouse explained that as soon as EITF abstracts are issued, "they become GAAP," and that EITF 01-09 specifically applies to the metals credits here, which operate as sales incentives, requiring them to be netted against gross receipts. The Comptroller did not rebut Sprouse's or Masters's testimony.

The main issue at the bench trial was whether, for Texas franchise tax purposes, Gulf should be permitted to report as "gross receipts" the amount of each service payment, netted with each corresponding metals credit, or whether it must report the full total of service payments, without adjustment for the metals credits. This is a significant distinction, as the amount of franchise tax that Gulf owes is directly affected by the "apportionment factor," which at all relevant times was

5

computed using a corporation's "gross receipts."[6] Act of May 7, 1999, 76th Leg., R.S., ch. 184, § 2, sec. 171.106(a), 1999 Tex. Gen. Laws 651, 652 (amended 2006) (current version at Tex. Tax Code § 171.106) (providing formula to apportion taxable capital and taxable earned surplus to this state, where gross receipts are component) (hereinafter Former Tex. Tax Code § 171.106); Act of May 25, 1993, 73d Leg., R.S., ch. 546, § 8, sec. 171.1121(a), 1993 Tex. Gen. Laws 2043, 2044 (amended 2006) (current version at Tex. Tax Code § 171.1121) (providing definition of gross receipts for taxable earned surplus) (hereinafter Former Tex. Tax Code § 171.1121).[7]

This dispute initially arose when the Comptroller audited Gulf for tax years 1997-2000, a period for which the Comptroller did not permit Gulf to report its gross receipts on a netted basis and which determination Gulf challenged in two lawsuits, which were settled by an agreed judgment. Gulf argues that since EITF became effective in 2002, the metals credits are now indisputably "allowances" that operate to reduce gross receipts. However, knowing the Comptroller's position on the netting of the service payment and metals credit from its prior audit and seeking to avoid incurring a penalty and interest, Gulf calculated and paid its franchise taxes without netting the amounts but concurrently filed a refund claim to recover the amount it claims it overpaid. After

[6] The franchise-tax statutes and the Comptroller's rules governing Gulf's liability for the tax years at issue in this case have been amended or repealed since Gulf filed its tax returns. Therefore, we cite to the versions in effect during the relevant years.

[7] Former section 171.106(a) provided that a corporation's taxable earned surplus and taxable capital "are apportioned to this state to determine the amount of tax imposed under Section 171.002(b)(1) [providing franchise tax rates ] by multiplying the taxable earned surplus [or taxable capital] by a fraction, the numerator of which is the corporation's gross receipts from business done in this state . . . and the denominator of which is the corporation's gross receipts from its entire business." Act of May 7, 1999, 76th Leg., R.S., ch. 184, § 2, sec. 171.106(a), 1999 Tex. Gen. Laws 651, 652 (amended 2006) (current version at Tex. Tax Code § 171.106).

the bench trial, the trial court agreed with the Comptroller and concluded that Gulf is not entitled to net the amounts and, therefore, is not entitled to any refund.

## STANDARD OF REVIEW

While Gulf makes several arguments supporting its contention that the trial court erred in making its determination that Gulf is not entitled to a refund, its issues on appeal stem from the trial court's construction of relevant Tax Code provisions and Comptroller rules, which are legal questions we review de novo. *See 7-Eleven, Inc. v. Combs*, 311 S.W.3d 676, 683 (Tex. App.—Austin 2010, pet. denied). When resolving an issue of statutory construction, we must first and foremost follow the plain language of the statute. *General Motors Corp. v. Bray*, 243 S.W.3d 678, 685 (Tex. App.—Austin 2007, no pet.). Under the plain meaning rule, if a statute is clear and unambiguous, it should be given its commonly understood meaning without resort to extrinsic aids of statutory construction. *Id.* Where a word appearing in a statute or rule is undefined by the legislature or governing agency, the word is given its plain and common meaning. *See McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003). Only if the statutory language is ambiguous do we defer to an agency's construction. *See Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006).

Administrative rules are ordinarily construed in the same manner as statutes. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999); *7–Eleven*, 311 S.W.3d at 683. Unless a rule is ambiguous, we follow the rule's clear language; when there is vagueness, ambiguity, or room for policy determinations in a rule, we defer to the agency's interpretation unless it is plainly inconsistent with the language of the rule. *BFI Waste Sys. of N. Am., Inc. v. Martinez Envtl. Grp.*, 93 S.W.3d 570, 575 (Tex. App.—Austin 2002, pet. denied).

7

We review a trial court's conclusions of law de novo, *Botter v. American Dental Ass'n*, 124 S.W.3d 856, 860 (Tex. App.—Austin 2003, no pet.), and do not defer to the trial court on questions of law, *Perry Homes v. Cull*, 258 S.W.3d 580, 598 (Tex. 2008). For mixed questions of law and fact, we defer to the trial court's factual determinations if supported by the evidence but review its legal determinations de novo. *Brainard v. State*, 12 S.W.3d 6, 30 (Tex. 1999).

## DISCUSSION

This dispute pits form against substance. Gulf argues, essentially, that the substance of these transactions governs, and that we must characterize the metals credits as GAAP does. In determining the Texas apportionment factor, Gulf asserts, the rules of the accrual method of accounting should take precedence over a non-binding, non-material "presentation error" on its federal tax returns. The Comptroller rejoins that Gulf is bound by the way it characterized the metals credits on its federal tax returns and may not attempt to "retroactively change" its accounting method merely to reduce its franchise tax liability. We disagree with the Comptroller that Gulf is attempting to "change" its accounting method or that, in this case, Gulf is bound by its characterization of the metals credits on its federal tax returns. We agree with Gulf that the characterization of the metals credits turns on the substance of the transactions and that, based on this record, the metals credits must properly be considered "allowances" under Texas tax law and should operate to reduce gross receipts.

During the years at issue, section 171.1121 of the Tax Code defined "gross receipts" as "all revenues reportable by a corporation on its federal tax return, without deduction for the cost of

8

property sold, materials used, labor performed, or other costs incurred, unless otherwise specifically provided in this chapter." Former Tex. Tax Code § 171.1121(a). Former section 171.1121 further provided that "a corporation shall use the same accounting methods to apportion taxable earned surplus as used in computing reportable federal taxable income." *Id.*

The Comptroller's Rule 3.557 in effect for the applicable period similarly provided that "gross receipts" means "all revenues that are recognized under the methods used for federal income tax purposes for the tax reporting period without deduction for the cost of property sold, materials used, labor performed, or other costs incurred, *unless otherwise specifically provided for in this section* or Tax Code, Chapter 171." 28 Tex. Reg. 1218 (2003), *repealed by* 38 Tex. Reg. 5109 (2013) (former 34 Tex. Admin. Code § 3.557) (Comptroller of Pub. Accounts, Earned Surplus: Apportionment) (hereinafter Former Rule 3.557) (emphasis added). Former Rule 3.557(e) further specifically provided that "sales returns and allowances that a seller allows reduce gross sales of the seller in the computation of gross receipts." *Id.*(e)(31).[8] Therefore, we are left to determine whether the "metals credits" at issue qualify as "allowances" as contemplated by the applicable regulations,

---

[8] Similarly, the applicable Comptroller Rule applying to the determination of gross receipts for the apportionment of taxable capital specifically excluded "allowances" from gross receipts. *See* 25 Tex. Reg. 12627 (2000), *adopted* 26 Tex. Reg. 1873 (2001), *repealed by* 38 Tex. Reg. 5109 (2013) (former 34 Tex. Admin. Code § 3.549(e)(35)). The amount of franchise tax due was determined during the applicable years by a calculation necessitating two components: "net taxable capital" and "net taxable earned surplus." *See* Act of Aug. 12, 1991, 72d Leg., 1st C.S., ch. 5, § 8.031, sec. 171.002, 1991 Tex. Gen. Laws 134, 154 (amended 2006) (current version at Tex. Tax Code § 171.002) (providing rates and formula for computation of franchise tax due). Because the parties' briefs focus on whether the metals credits reduce gross receipts for purposes of earned surplus, our discussion will reference the applicable statutes and rules addressing earned surplus. However, our analysis and holding will equally apply to the issue of whether the metals credits reduce gross receipts for the taxable-capital component of the franchise-tax calculation.

9

which is a legal determination we review de novo.[9] *See Botter*, 124 S.W.3d at 860. If so, Gulf is entitled to a refund.

Courts have not had occasion to construe Former Rule 3.557's use of the term "allowance," and neither the Tax Code nor the Comptroller's regulations provide a definition for the term. Therefore, we consider its ordinary, common meaning. *See McIntyre*, 109 S.W.3d at 745. Allowance is defined as a "deduction," Black's Law Dictionary 89 (9th ed. 2009), and "a reduction from a list price or stated price (as one granted on used products turned in or because of previous credit)," Webster's Third New Int'l Dictionary 58 (2002). These definitions and the use of the term "allowance" in Former Rule 3.557 imply a transaction between two parties wherein the seller (of goods or services) "allows" the buyer a credit or reduction against an original or stated price.

The uncontroverted evidence in the form of (1) the contracts between Gulf and its customers, (2) the professional auditors' reports of how and when Gulf records revenue in its financial statements, and (3) the testimony of Masters and Sprouse leads us to conclude that the metals credits must be defined as allowances, contrary to the trial court's findings that there was "no evidence" that the metals credits constitute allowances. Specifically, the governing contracts provided that the two fees would be netted and invoiced together and contemplated instances when Gulf would actually receive *no* payment (i.e., no receipt or revenue) from its customer but would, rather, pay the customer for the value of the metals contained in the spent catalyst. Once

---

[9] The trial court made findings of fact and conclusions of law, several of which Gulf challenges on appeal in addition to its first issue contending that the trial court erred in determining that it is not entitled to a refund based on netting the two trial balance accounts. The trial court's findings of fact nos. 9 and 10 found that Gulf offered "no evidence" that the metals credits "constituted an allowance" or "should be treated as an allowance." Its corresponding conclusion of law determined that the metals credits do not "qualify" as allowances under the Comptroller's applicable rules.

Gulf received the spent catalyst from its customer, under the applicable contracts and as Masters explained Gulf's operations, Gulf was entirely responsible for processing the catalyst, extracting the metals, computing the amount of metals credit, and invoicing the customer for the difference between the service payment and metals credit, if any. With respect to the invoiced transactions wherein the metals credit exceeded the contracted service payment, Gulf would recognize *no* revenue and receive *no* payment from its customer. When the contracted service payment exceeded the metals credit, Gulf would recognize revenue, but only in the amount of the difference between the two amounts. Under these circumstances, the metals credits must be considered allowances as a matter of law. Accordingly, Gulf must be permitted to exclude from its computation of gross receipts any transactions in which its issuance of a "metals credit" exceeded its receipt of a "service payment" and, for transactions in which the service payment exceeded the metals credit, net together the service payment and metals credit to determine gross receipts.

Additionally, we consider persuasive case law from the Tax Court of the United States that directs courts to look to the substance of a transaction rather than its form when determining whether an adjustment should properly be considered an allowance. In *Pittsburgh Milk*, the Tax Court considered whether a corporation's sales of milk at illegally discounted prices should be used to compute gross sales or whether the fictitious higher prices entered in the corporation's books should be used. *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707, 708 (1956). The Tax Court held that, notwithstanding the illegal nature of the sales, the gross sales must be computed using the agreed net prices rather than the fictitious higher prices. *Id.* It reasoned that "each type of transaction must be analyzed with respect to its own facts and surrounding circumstances," and that the "actual facts,

11

not bookkeeping entries, control the determination of taxable income." *Id.* at 717. The "test" to be applied is, "What did the parties really intend, and for what purpose or consideration was the allowance actually made? Where, as here, the intention and purpose of the allowance was to provide a formula for adjusting a specified gross price to an agreed net price, and where the making of such adjustment was not contingent on any subsequent performance or consideration from the purchaser, then, regardless of the time or manner of the adjustment, the net selling price agreed upon must be given recognition for income tax purposes." *Id.*; *see also State v. Shell Oil Co.*, 747 S.W.2d 54, 56 (Tex. App.—Austin 1988, no writ) (franchise tax statute contemplates that tax be determined upon corporation's "true financial condition" and holding that corporation was entitled to exclude from its calculation of taxable capital its "contra-asset" accounts, consisting of amortized unproductive leaseholds, because such accounts were not available for use by company and including them would "project a distorted view of the taxpayer's financial condition"). We believe that this reasoning is sound, applies to the facts in this case, and requires a determination that the metals credits were allowances.[10] Furthermore, this reasoning aligns with contemporary GAAP principles on the

[10] Contrary to the spirit of *Pittsburgh Milk*, the evidence that the Comptroller cites elevates form over substance: (1) the federal tax returns that Gulf filed for each of the three years in which it failed to characterize the metals credits as allowances and (2) the "trial balance sheets" in which Gulf internally "tracked" the metals credits (as "environmental expenses") separately from the service payments (as "environmental income"). However, the legal determination of whether the metals credits constitute allowances under Texas law cannot turn on the labeling of such credits in Gulf's internal books or tax forms but must turn, rather, on the substance of the transactions. Additionally, the Comptroller does not cite any authority rendering Gulf's characterization of the metals credits on its federal tax returns as binding on its determination of gross receipts for the franchise tax. Although the Comptroller contends that by attempting to reduce its gross receipts by these "allowances" Gulf is unlawfully and retroactively "changing its accounting method" from the method it used in "computing reportable federal taxable income," we do not consider Gulf's non-material error on its federal return as reflective of a "different accounting method" from the accrual method its witnesses testified it has used at all relevant times. However, even if Gulf could be considered to be "changing" its accounting method by seeking to exclude from its gross receipts the

12

treatment of sales incentives and other consideration given by a vendor to a customer as explained in EITF 01-09.

## CONCLUSION

We hold that the "metals credits" at issue in this case constitute "allowances" under Former Comptroller Rules 3.557 and 3.549 and that, therefore, Gulf was entitled to a refund of franchise taxes by adjusting its computation of gross receipts to account for these allowances. The trial court erred in determining otherwise, and we reverse its final judgment and remand this cause for further proceedings, in accordance with this opinion, to determine the amount of refund to which Gulf is entitled.

_____

David Puryear, Justice

Before Chief Justice Rose, Justices Puryear and Goodwin

Reversed and Remanded

Filed:   March 26, 2015

---

metals credits, the Tax Code explicitly permitted a corporation to change its accounting method "used to calculate gross receipts" once every four years, *without* consent of the Comptroller. *See* Act of May 25, 1993, 73d Leg., R.S., ch. 546, § 8, sec. 171.1121(a), 1993 Tex. Gen. Laws 2043, 2044 (amended 2006) (current version at Tex. Tax Code § 171.1121).

13