# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

### NO. 03-08-00212-CV

**7-Eleven, Inc., Appellant**

**v.**

**Susan Combs, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. D-1-GN-04-003369, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

We withdraw our opinion and judgment dated August 31, 2009, and substitute the following opinion in place of the earlier one.

Appellant 7-Eleven, Inc. brought suit against Susan Combs, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas (collectively, the "State") seeking a partial refund of sales tax that the Comptroller assessed on 7-Eleven's purchase of financial software for its retail stores. The parties filed cross-motions for summary judgment; the trial court granted the State's motion and denied 7-Eleven's. On appeal, 7-Eleven asserts that it was entitled to recover taxes assessed on the portion of the sales price of the software that was (1) transferred to stores operated by third-party franchisees, all of which were

outside of Texas, and (2) delivered to those 7-Eleven-operated stores ("company stores") that were located outside of Texas. We will reverse the summary judgment in favor of the State and remand the cause to the trial court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

7-Eleven is a Texas corporation that operates retail convenience stores, and franchises others, throughout the United States. In 1993, 7-Eleven purchased a nonexclusive, perpetual license to "use, reproduce, and possess" custom computer software developed by Canmax Retail Systems, Inc. and designed to manage and automate 7-Eleven's stores. The Canmax software was developed and implemented in several phases. In the initial phase, "host software" was installed on 7-Eleven's corporate mainframe, referred to as the "host" computer, while "store software" was installed on the in-store computers. According to Paul Hanson, who managed 7-Eleven's Internal Audit Division during the relevant period, Canmax delivered separate "gold masters" of the host software and the store software. As Hanson explained in his deposition testimony, the host software permitted the corporate mainframe to communicate directly with the store computers, allowing the stores to transmit data to the corporate mainframe for processing. Hanson testified that a distinction was made between the host software and the store software because those were "two separate things" "based upon where that software resided and what it did."

Hanson testified extensively concerning the functionality and use of the Canmax software, both by the 7-Eleven corporate office and by the stores themselves. Hanson stated that the Canmax software was the "backbone" of 7-Eleven's financial records because it captured the data necessary to conduct and monitor sales and other store functions. The software's "data-capture"

2

function replaced the system of manually submitting data from a store to 7-Eleven's corporate office on written forms. He also explained how 7-Eleven then used the software to perform "data-processing services" for the stores based on the information that was entered at the store level and transmitted electronically to the host computer.[1] In one example, Hanson discussed the preparation of a payroll report, which would be generated by the host computer and provided to the stores on a weekly basis, showing the "gross to net pay calculation" for each employee during each pay period. In another example, Hanson explained how the Canmax store software could be used "as a tool to help control the receipts or cash in the store and assign that to individual shifts, to individual employees, to hold them accountable." Such data, Hanson explained, would not necessarily be transmitted "up to the mainframe," but rather would be used in "purely a store-level report to help the store manage its operation."

Kathy Naumann, 7-Eleven's information systems manager during the relevant period, also testified by deposition about the Canmax software's functionality and how it permitted the store computers to interface with the corporate host computer. Referring specifically to phase one of the

---

[1] Hanson testified:

> All the Canmax software did was automate the capture of data that was already being captured manually. So, like, for instance, we've spoken about the sales. So prior to the Canmax software, the stores would fill out a piece of paper called a cash report and send that piece of paper to an accounting office, and the accounting office would take that piece of paper and key that data directly into our mainframe computer. The Canmax software allowed the store operator—instead of filling out a piece of paper, he filled out a computer screen, if you will. So the store operator keyed the data directly into a computer, a computer that resided at the store, and then a host computer would poll that computer once a day and extract that data out of it and then upload it to this mainframe.

Canmax store software, Naumann stated that it "processed—collected the information for—and created the cash report" and allowed for "the gathering of timesheet data for payroll purposes, the gathering of gasoline inventory measurements, the gathering of gasoline delivery invoice information, the gathering of detail sales data for money orders and the gathering of transaction information for credit card sales."

The next phase of the store software, according to Naumann, "ran on a scanning cash register" and fed information that it collected from the cash register to the in-store computer. She testified that this phase of the store software (referred to as "Pre-POS") was installed only in franchise stores located outside of Texas; it was not installed on the host computer or at any company stores.

The final software phase relevant to this appeal, Phase 2B, included "scanning point-of-sale registers," designed to replace non-scanning, Pre-POS software in the stores. The Phase 2B software's "key functionality" was to automate the stores' ordering system. As Naumann explained,

> The stores have in their store software their inventory items and the software allows them to place an order for each vendor for each merchandise item and then that order is uploaded to the host software and from there sent to the vendors and the CDCs [consolidated distribution centers] so that they can deliver that merchandise to the stores.

Like the Pre-POS software, the Phase 2B software was installed only in the stores, not at the host.[2] By 1996, 7-Eleven had installed Canmax software at 286 company stores in Texas, 1,742 company stores outside of Texas, and 2,946 franchise stores. All of the franchise stores were outside of Texas.

Before installation of the Phase 2B store software was underway, the Comptroller audited 7-Eleven for sales-tax compliance for the period of April 1, 1993, through September 30, 1996. The auditor determined that the amount of the software-licensing fee attributable to the retail store software during the audit period was $3,628,230, and assessed sales tax on the store software in the amount of $299,328.98.[3] 7-Eleven filed a petition for a redetermination and obtained a hearing, *see* Tex. Tax Code Ann. §§ 151.509-.511 (West 2008). The Comptroller issued her original decision in the matter on June 10, 2002, granting 7-Eleven's contention that its purchase of Canmax store software for its franchisees was an exempt sale-for-resale purchase; therefore, the Comptroller found that 7-Eleven "was entitled to relief for software loaded onto the PCs of the franchisees." The Comptroller also found that 7-Eleven was entitled to relief "relative to software loaded onto PCs shipped from Atlanta, Georgia, [where the software was staged] to its non-Texas company stores, because the software was purchased for resale, and there was no divergent use of the software in Texas prior to its shipment to Atlanta, Georgia, for staging."

---

[2] Naumann testified that Canmax developed only the Phase 2B *store* software. An entirely different company developed the Phase 2B *host* software.

[3] As the parties explained during oral argument, the Comptroller separately assessed sales tax on the host software. 7-Eleven has challenged that assessment in a separate suit unrelated to this appeal.

The Administrative Hearings Section moved for rehearing, arguing that the resale exemption did not apply "because (1) the software was not purchased solely for resale, citing [tax code] section 151.006 (i.e., Petitioner also used the software in its company stores)" and "(2) there was no showing that the software was held in inventory for resale." Based on this first ground, the Comptroller reversed her original decision, finding that because 7-Eleven's transfer of the software to its franchisees "was incidental to the real property rental," the purchase was "specifically excluded from the resale exemption" by section 151.006(a)(2).

After paying the tax under the statutory protest procedures, 7-Eleven filed suit for a tax refund under chapter 112 of the tax code. *See id.* §§ 112.001-.056 (West 2008). 7-Eleven sought a partial refund in the amount of $282,118, plus penalties and interest. According to 7-Eleven, this sum represented the portion of the sales price attributable to the store software that was either (1) transferred to third-party franchisees outside of Texas or (2) delivered to 7-Eleven-operated stores outside of Texas; 7-Eleven contended that neither should be subject to Texas sales and use tax. 7-Eleven argued that the software transferred to the franchise stores qualified for the sale-for-resale exemption in section 151.302 of the tax code. *See id.* § 151.302(b) (West 2008) (providing that sale for resale of taxable item is exempted from sales and use tax); *see also id.* § 151.006(a)(3) (defining "sale for resale" to mean sale of tangible personal property to purchaser who acquires property for purpose of transferring it in United States as integral part of taxable service). Therefore, 7-Eleven urged that it was entitled to purchase all of the store software tax-free and place it in a "tax-free inventory" because it intended to resell some of the software to its franchisees. With respect to the software that was ultimately shipped to company stores outside of Texas, 7-Eleven argued that the

6

relevant inquiry is whether use tax—not sales tax—was due; thus, because the store software shipped to out-of-state company stores "was never used in Texas," 7-Eleven maintained that "it was not subject to the Texas use tax under Texas Tax Code § 151.011(f)." *See id.* § 151.001(f) (West 2008) (providing that "use" does not include exercise of right or power over tangible personal property for purpose of transporting it outside state for use solely outside Texas).

7-Eleven moved for summary judgment, attaching to its motion, among other evidence, Hanson's calculation that 7-Eleven would be entitled to a refund of $282,118 in the event the court concluded that the copies of the software delivered to out-of-state company and franchise stores were not taxable.[4]

7-Eleven also attached a copy of a Store Franchise Agreement, which indicates that 7-Eleven provides data-processing services to its franchisees—including bookkeeping, payroll, and accounts payable—as part of the bundle of services, the license of 7-Eleven's service mark and proprietary products, and the lease of the store and equipment, for all of which the franchisees pay 7-Eleven a lump-sum monthly payment referred to as "the 7-Eleven Charge." Regarding these services, the Store Franchise Agreement states:

---

[4] Hanson calculated these amounts based on the Comptroller's auditor's determination that the fair market value of the licensing fee for all of the store software was $3,628,230. From that figure, Hanson calculated "the fair market value of individual copies of the software" by dividing "the licensing fee attributed to the store software by the total number of store copies made." The 286 copies sent to company stores in Texas, which 7-Eleven conceded would be taxable, represented $208,620 of the total fair market value, while the 1,742 out-of-state company stores and 2,946 franchise stores represented $1,270,683 and $2,148,928 respectively. Based on these values, 7-Eleven asserted that it was entitled to a refund of $104,831 on the copies of the software sent to out-of-state company stores and $177,287 on the copies sent to franchise stores, resulting in a total refund sought of $282,118.

If FRANCHISEE is not in breach of this Agreement, 7-ELEVEN shall: (i) provide Financial Summaries for FRANCHISEE for the Store prepared from the Bookkeeping Records in the form of an income statement and a balance sheet for each Accounting Period or any portion thereof as 7-ELEVEN may deem necessary and for each calendar year, payroll checks for FRANCHISEE's Store employees, draw checks, and merchandise reports; (ii) timely pay on behalf of FRANCHISEE, upon approval and submission to 7-ELEVEN, bank drafts and invoices for Purchases (as verified by vendor statements), bills for Operating Expenses, and the payroll for FRANCHISEE's Store employees; and (iii) assist FRANCHISEE in the preparation and filing of business tax reports and returns (except FRANCHISEE's income tax and related returns) to the extent the information is available from the Bookkeeping Records.

The Store Franchise Agreement further provides:

FRANCHISEE shall prepare and furnish to 7-ELEVEN, on forms and at times acceptable to and as requested by 7-ELEVEN: (i) daily summaries of Purchases; (ii) daily reports of Receipts; (iii) weekly time and wage authorizations for FRANCHISEE's Store employees; (iv) all information requested by 7-ELEVEN regarding the vendors from which FRANCHISEE makes purchases; and (v) all such additional reports as 7-ELEVEN may require from time to time.

In his affidavit attached to 7-Eleven's motion for summary judgment, Hanson averred that the Canmax software was an integral part of the data-processing service provided by 7-Eleven "because it provided the method and the means" by which the franchisees recorded their financial information and transmitted it to the host computer for processing.

The State filed a cross-motion for summary judgment, asserting that the sale-for-resale exemption was not applicable to the software transferred to the franchise stores because the essence of that transaction "was a purchase of stores-automation software, not a purchase

8

of software that is an integral part of data processing services." Specifically, the State urged the following five grounds for summary judgment:

(1) the Canmax store software was purchased in Texas from a Texas seller, and therefore sales tax was due at the time of purchase;

(2) the sale-for-resale exemption does not apply "because only a small portion of the Canmax software can reasonably be characterized as an integral part of taxable data processing services" and because "7-Eleven derives a direct benefit on an ongoing basis from the Canmax software that is transferred to franchise stores";

(3) 7-Eleven cannot prevail on its tax code section 151.011(f) "claim" because that statute is "definitional and inapplicable to a sales tax transaction" or, in the alternative, because 7-Eleven failed to substantiate its claim that the software was transferred out of state solely for use outside of Texas;

(4) the "essence-of-the-transaction" test results in taxability because the Canmax store software was geared toward automating 7-Eleven's retail stores, not data-processing services; and

(5) 7-Eleven's claims are barred by the doctrines of exhaustion of administrative remedies, ripeness, sovereign immunity, and limitations.[5]

The trial court granted the State's motion for summary judgment, denied 7-Eleven's motion, and ordered that the State retain the taxes at issue. 7-Eleven appeals, arguing by one issue that it is entitled to a partial refund of the taxes paid on the copies of the software transferred to third-party franchisees and those company stores located outside of Texas.

---

[5] On appeal, the State does not raise the arguments made in its fifth summary-judgment ground; therefore, we will not address them.

9

**STANDARDS OF REVIEW**

To be entitled to summary judgment, the movant must establish that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). In our de novo review of a summary judgment, "we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). When, as here, both parties move for summary judgment on overlapping issues and the district court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment that the district court should have rendered. *Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 648 (Tex. 2004).

The issues raised in this appeal turn primarily on the construction of the tax code and the Comptroller's rules. Statutory construction is a question of law that we review de novo. *See Bragg v. Edwards Aquifer Auth.*, 71 S.W.3d 729, 734 (Tex. 2002). In construing statutes, we ascertain and give effect to the legislature's intent as expressed by the language of the statute. *Id.*; *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We use definitions prescribed by the legislature and consider any technical or particular meaning that the words have acquired. Tex. Gov't Code Ann. § 311.011(b) (West 2005). Otherwise, we construe the statute's words according to their plain and common meaning, *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004), unless a contrary intention is apparent from the context, *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n*, 616 S.W.2d 187, 189 (Tex. 1981), or unless such a construction leads to absurd results, *University of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 356

(Tex. 2004); *see also Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex. 2004) (noting that when statutory text is unambiguous, courts must adopt interpretation supported by statute's plain language unless that interpretation would lead to absurd results).

"We construe administrative rules, which have the same force as statutes, in the same manner as statutes." *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). "Unless the rule is ambiguous, we follow the rule's clear language." *Id.* We defer to an agency's interpretation of its own rule when the rule is vague or ambiguous, unless the administrative interpretation is "plainly erroneous or inconsistent with the regulation." *See id.* at 254-55 (quoting *Public Util. Comm'n v. Gulf States Util. Co.*, 809 S.W.2d 201, 207 (Tex. 1991)).

**DISCUSSION**

On appeal, 7-Eleven urges that the software transferred to third-party franchisees qualified for the sale-for-resale exemption. It further asserts that, because it intended to resell some of the Canmax store software to its franchisees, it was initially entitled to purchase all of the software—including the software that it ultimately transferred to its company stores in and outside of Texas—without paying sales tax by putting all of the software in a "tax-free inventory." Thus, according to 7-Eleven, the issue regarding the software that it did not resell to its franchise stores

11

(i.e., that it transferred to its company stores) is whether that software was used in Texas.[6] We will address each argument in turn.

## I. *The State's Entitlement to Summary Judgment: Franchise Stores*

### (1) Sale-for-Resale Exemption

The parties filed motions for summary judgment that joined issue on whether 7-Eleven was entitled to claim the sale-for-resale exemption for the store software it purchased for and transferred to its franchise stores, all of which were located outside of Texas. *See* Tex. Tax Code Ann. § 151.302(a) ("The sale for resale of a taxable item is exempted from the taxes imposed by this chapter."). The trial court granted the State's motion, which urged that 7-Eleven was not entitled to claim the sale-for-resale exemption as to the software that it delivered to its franchise stores and, as a result, its initial purchase of the store software was taxable.

The purpose of the sale-for-resale exemption is to prevent double taxation. *Sharp v. Clearview Cable TV, Inc.*, 960 S.W.2d 424, 426 (Tex. App.—Austin 1998, pet. denied) ("[T]he Tax Code recognizes that the same goods should not be taxed twice; only the ultimate owner of the goods should be burdened by the sales tax."). Tax exemptions are to be strictly, but reasonably, construed against the taxpayer. *Id.*; *see North Alamo Water Supply Corp. v. Willacy County Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex. 1991). An exemption cannot be raised by implication,

---

[6] In this regard, 7-Eleven argues that the issue is whether the software transferred to its company stores was subject to use tax rather than sales tax. While 7-Eleven concedes that the store software that it installed in its company stores in Texas was subject to Texas use tax, it argues that no use tax was owed on the store software that was shipped to company stores outside of Texas because that software was never "used" in Texas.

12

but must affirmatively appear in the statute, and all doubts are resolved in favor of the taxing authority and against the claimant. *Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 272 (Tex. 1979).

Under the tax code, "sale for resale" includes a sale of "tangible personal property to a purchaser who acquires the property for the purpose of transferring it . . . as an integral part of a taxable service." Tex. Tax Code Ann. § 151.006(a)(3) (West 2008).[7] 7-Eleven asserts, and the State does not dispute, that its transfer of the store software to its franchisees qualifies as a sale. *See id.* § 151.005(1), (2) (defining "sale" to include both "a transfer of title or possession of tangible personal property" and "the exchange, barter, lease, or rental of tangible personal property"). A "taxable service" is defined to include "data processing services," *see id.* § 151.0101(a)(12) (West 2008), which is in turn defined to "include[] word processing, data entry, data retrieval, data search, information compilation, payroll and business accounting data production, the performance of a totalisator service with the use of computational equipment required by the Texas Racing Act, and other computerized data and information storage or manipulation," *see id.* § 151.0035 (West 2008) (internal citations omitted). "'Data processing service' also includes the use of a computer or computer time for data processing whether the processing is performed by the provider of the computer or computer time or by the purchaser or other beneficiary of the service." *Id.*

---

[7] "Tangible personal property" is defined as "personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner," and, "for the purposes of this chapter, the term includes a computer program." Tex. Tax Code Ann. § 151.009 (West 2008). It is undisputed that the Canmax store software is tangible personal property under this definition.

The tax code further provides that the Comptroller has exclusive jurisdiction to interpret the statute defining "taxable service." *See id.* § 151.0101(b). The Comptroller's rule interpreting section 151.0101 states that data-processing services "specifically includes word processing, payroll and business accounting, and computerized data and information storage or manipulation" and notes that examples of data-processing services "include entering inventory control data for a company, maintaining records of employee work time, filing payroll tax returns, preparing W-2 forms, and computing and preparing payroll checks." *See* 34 Tex. Admin. Code § 3.330 (2009) (Tex. Comptroller of Pub. Accounts, Data Processing Services).

7-Eleven argues that the record establishes that it performed data-processing services for its franchise stores. We agree. Pursuant to the Store Franchise Agreement, for example, 7-Eleven was required to compute and provide its franchisees financial summaries, merchandise reports, and payroll checks, all of which were based on and prepared from the store's bookkeeping records. In addition, the Store Franchise Agreement sets forth that 7-Eleven was required to assist its franchisee in the preparation and filing of business tax reports and returns, "to the extent the information is available from the Bookkeeping Records." The bookkeeping records consist of data that is entered, transmitted, received, and processed using the Canmax system software. 7-Eleven thus argues that the Canmax software was an "integral part" of the data-processing services it provided because the software offered "the method and the means by which the franchisees recorded the financial information and transmitted it to 7-Eleven for processing."

The State argues in response that the transfer of the Canmax software was not, in fact, integral to the data-processing services 7-Eleven provides to its franchisees because the evidence

14

demonstrates that the true purpose of the software was to automate 7-Eleven's stores for 7-Eleven's own benefit. The State points to evidence that 7-Eleven's corporate divisions received copies of reports that were provided to the stores and that data collected using the store software was used by 7-Eleven in preparing its own tax returns, setting its gasoline prices, and performing corporate accounting and audit functions. According to the State, the "purpose" requirement of section 151.006 is not met because "7-Eleven's actual use of the Software clearly evidences a purchase for its own use, as opposed to a transfer of Software to a third party as part of a resale transaction."[8] In essence, the State argues that, in order for 7-Eleven's purchase of the software to qualify as a sale for resale under section 151.006, the transfer of the store software from 7-Eleven to its franchisees cannot have provided any "direct benefit" to 7-Eleven. We disagree.

In the first place, nothing in the statute indicates that the purchaser of tangible personal property who transfers it as an integral part of a taxable service may not obtain any benefit from the transaction. Neither the statute's plain text nor its context within chapter 151 suggests that

---

[8] More precisely, however, the evidence shows that many of the benefits 7-Eleven received were from its own use of the *host* software in conjunction with the franchisees' use of the *store* software. As Hanson testified, the Canmax software functioned by having the store operator key "data directly into a computer, a computer that resided at the store, and then a host computer would poll that computer once a day and extract that data out of it and then upload it to this mainframe."

While it is clear from the summary-judgment evidence that the store software and the host software functioned in concert with one another, the record reveals that the reports and other processes that the State cites as evidence of a direct benefit to 7-Eleven were actually generated by the host software—a distinct product that was assessed a separate sales tax (which, as the parties acknowledged during oral argument, is being challenged in a separate proceeding). It is therefore unclear why the State, having separately valued and taxed the portions of the licensing fee attributable to the store software and the host software, appears now to conflate the two products, citing evidence in its brief showing how 7-Eleven used the *host* software for its own benefit as support for its argument that the *store* software was actually purchased for 7-Eleven's own use.

15

the derivation of a "benefit" by the party performing the taxable service negates what would otherwise qualify for the sale-for-resale exemption. *See In re Bell*, 91 S.W.3d 784, 790 (Tex. 2000) ("courts should not insert words in a statute except to give effect to clear legislative intent"); *Williams v. Texas State Bd. of Orthotics & Prosthetics*, 150 S.W.3d 563, 573 (Tex. App.—Austin 2004, no pet.) ("[W]e will not read into an act a provision that is not there . . . ."). Thus, evidence that 7-Eleven's corporate divisions also reviewed and benefited from reports that were generated using the store software, for example, does not alter the fact that the transfer of the store software to the franchisees was integral to 7-Eleven's performance of data-processing services. *Cf. Strayhorn v. Raytheon E-Systems, Inc.*, 101 S.W.3d 558, 567 (Tex. App.—Austin 2003, pet. denied) (rejecting Comptroller's argument that reseller's control over property for its own use defeated its claim for sale-for-resale exemption, noting that nothing in tax code required sale to hinge on elements of control and use). So long as the purchaser's intent in acquiring the property was to transfer it as an integral part of a taxable service, the elements of the section 151.006(a)(3) definition would appear to be satisfied.

Moreover, even interpreting the statute to permit consideration of the benefits allegedly received by the parties to the transaction, we disagree that the statute contains a requirement that the recipient of the service be the *sole* benefiting party. Such a construction would impose on the party seeking eligibility for the sale-for-resale exemption an impractical burden, requiring a showing not only that the transfer of the property was integral to its provision of a taxable service, but also that the transferor of the property received no benefit from the transfer beyond receipt of the sales price. *See* Tex. Gov't Code Ann. § 311.021(3) (West 2008); *Old Am. County*

16

*Mut. Fire Ins. Co. v. Sanchez*, 149 S.W.3d 111, 117 (Tex. 2004) (requiring that we reject statutory interpretation that would lead to unreasonable result). The more reasonable interpretation of the "purpose" requirement is that it exists to prevent parties from obtaining favorable tax treatment premised on a sham arrangement wherein little or no taxable services are actually rendered. This is consistent with the sale-for-resale exemption's purpose being to avoid double taxation, because if there were no performance of significant services subject to sales and use tax, taxing any tangible personal property integral to the performance of those services would not result in double taxation.

Here, even taking into account the benefits that 7-Eleven received,[9] the summary-judgment record does not show that the effects of the store software were so one-sided in 7-Eleven's favor that its claim to have purchased the software as an integral part of its provision of data-processing services is merely pretense. On the contrary, the record shows that the franchisees derived a substantial actual benefit from the taxable services rendered by 7-Eleven. The evidence is undisputed that 7-Eleven used the store software to perform payroll and accounting functions for the franchisees; to store and manipulate the stores' computerized data and information, including inventory data; to maintain records of store employee work time; and to compute and prepare the store employees' payroll checks—all of which are identified as data-processing services in the Comptroller's rule defining that term. *See* 34 Tex. Admin. Code § 3.330.

---

[9] In its reply brief, 7-Eleven acknowledges that it benefited "from all the goods and services that it transferred to the franchisees, including the computers, store furniture, the trademarks, the consultations, the data processing, and other items. All of these items tended to increase franchise sales, thereby increasing the fees to 7-Eleven."

17

The State further argues that 7-Eleven cannot avail itself of the sale-for-resale exemption because "only a small portion of the Canmax software can reasonably be characterized as an integral part of a taxable data processing service." According to the State, some aspects of the store software—specifically Phase 2B—were "unrelated" to the performance of data-processing services. The record shows that Phase 2B was designed to permit the stores to upload their merchandise orders to the host computer, which processed and transmitted the order data to the vendors for the purpose of supplying merchandise to the stores. Naumann testified that Phase 2B included "transmission of order information" to 7-Eleven's consolidated distribution centers and vendors, as well as "sales trend information for the stores."

We reject the State's argument for two reasons. First, as a matter of law, we do not construe the statute to require that the tangible personal property be committed solely to the performance of the taxable service in order for section 151.006(a)(3) to be satisfied. Rather, the statute is phrased in terms of whether the property is "an integral part of a taxable service." *See* Tex. Tax Code Ann. § 151.006(a)(3); *see also Webster's Third New Int'l Dictionary* 1173 (1986) ("integral" means "of, relating to, or serving to form a whole; essential to completeness; constituent; inherent"). Because the evidence confirms that the store software was important to the performance of data-processing services that were performed by 7-Eleven, it is not relevant under the statute that the store software may have been put to other uses as well.[10] Further, as a matter of fact, the

---

[10] Accordingly, we also reject the State's assertion that the sale-for-resale definition is not met because the stores themselves were capable of generating their own reports using the store software. The record does not support the State's argument that "the Stores are the ones actually doing the data processing."

evidence shows that even the Phase 2B software was integral to 7-Eleven's "storage and manipulation" of the Store's computerized sales-trend and merchandise-ordering data, processes that are expressly defined as data-processing services under the tax code. *See* Tex. Tax Code Ann. § 151.0035 (data-processing services specifically include data entry, data retrieval, data search, information compilation, and other computerized data and information storage or manipulation). Based on our review of the record, we disagree with the State's contention that "only a small portion" of the Canmax store software was used for data-processing services.[11]

### (2) "Essence-of-the-Transaction" Test

In a separate but related argument, the State argued in its motion for summary judgment that 7-Eleven was not entitled to purchase the Canmax store software tax-free because the software purchase fails the judicially created "essence-of-the-transaction" test. According to the State, the store software was purchased not for the purpose of providing data-processing services for 7-Eleven's stores, but was instead done to automate 7-Eleven's operations and to protect 7-Eleven's franchise fee. These purposes, the State argues, reveal that the essence of the transaction between 7-Eleven and its franchisees was not the transfer of tangible personal property as an integral part of a taxable service, and therefore 7-Eleven is not entitled to the sale-for-resale exemption.

The essence-of-the-transaction test was developed to address situations involving a "mixed transaction" of both taxable and nontaxable elements. *See, e.g.*, *Bullock v. Statistical*

---

[11] Likewise, we disagree that 7-Eleven was required to produce evidence "to show what percentage of the development charge was for Phase 1, pre-POS, or Phase 2B software" in order to be entitled to summary judgment, given that all phases of the store software—not just Phase 1—are properly seen as integral to the performance of data-processing services.

19

*Tabulating Corp.*, 549 S.W.2d 166, 167 (Tex. 1977); *Rylander v. San Antonio SMSA Ltd. P'ship*, 11 S.W.3d 484, 487 (Tex. App.—Austin 2000, no pet.); *Williams & Lee Scouting Serv. Inc. v. Calvert*, 452 S.W.2d 789, 792 (Tex. Civ. App.—Austin 1970, writ ref'd). In *Williams & Lee*, the case in which the essence-of-the-transaction test was first applied, the Comptroller assessed sales tax on printed reports produced by a company performing scouting services for oil companies.[12] 452 S.W.2d at 790. The printed materials summarized the oil and gas well data that the company gathered and furnished to its subscribers for a monthly charge, but the record showed that the same information was also communicated by telegraph and over the telephone, rather than in printed reports. *Id.* at 790-91. The scouting company challenged the tax assessment, arguing on appeal that "the essence of the transaction involved in this instance is the performance of a service for oil companies, namely, a scouting service." *Id.* at 792. At that time, the sales tax had not been extended by the legislature to cover services. *Id.* Therefore, in order to determine whether the scouting reports were subject to sales tax, the *Williams & Lee* court focused its inquiry on what was really being sold—a scouting report, which consisted of information presented in a permanent, tangible form and was therefore taxable, or a service, which was not taxable. *Id.* The court held that because the value from the standpoint of the subscriber was in the information itself, regardless of what form the information took, the true transaction was the selling of a service and therefore was not subject to sales tax. *Id.* at 792-93.

---

[12] "Scouting service is the timely procuring of statistical data on oil and gas wells, necessary to keep oil operators informed of developments in their industry." *Williams & Lee Scouting Serv. Inc. v. Calvert*, 452 S.W.2d 789, 790 (Tex. Civ. App.—Austin 1970, writ ref'd).

Subsequently, courts have applied the essence-of-the-transaction test to other scenarios involving the bundling of a nontaxable service with a taxable sale or service. *See, e.g.*, *Statistical Tabulating*, 549 S.W.2d at 167 (holding essence of transaction was nontaxable data-processing service, which was performed by translating raw data onto punch cards that customers fed into computer; court therefore held that transfer of punch cards was not taxable sale); *San Antonio SMSA*, 11 S.W.3d at 487 (holding that nontaxable engineering services bundled with sale of telecommunications equipment was not taxable); *Comptroller of Pub. Accounts v. Austin Multiple Listing Serv., Inc.*, 723 S.W.2d 163, 165 (Tex. App.—Austin 1986, no writ) (holding essence of transaction was processing of real-estate data, rather than printing of weekly listing-service book).

As this Court explained in *San Antonio SMSA*, the essence-of-the-transaction test involves the following inquiry:

> If the real object of a mixed transaction is the purchase of equipment which is taxable, and the service element is incident to that purchase, the entire transaction is taxable. On the other hand, if the essence of the transaction is the purchase of a nontaxable service, which incidentally includes the purchase of some other service or equipment that is taxable, the entire transaction is nontaxable.

11 S.W.3d at 487 (citations omitted). Ultimately, this Court in *San Antonio SMSA* determined that the transaction at issue, which involved the performance of nontaxable engineering services as part of the taxable sale of telecommunications equipment, did not fall into either category because "each transaction is independently desired and independently provided." *Id.* Therefore, the Court recognized a third category in which the two elements of a mixed transaction involving services and

21

tangible property are "'readily separable': 'When there is a fixed and ascertainable relationship between the value of the article and the value of the services rendered, and each is a consequential element capable of a separate and distinct transaction, then the elements must be analyzed as separate transactions for tax purposes.'" *Id.* at 488 (quoting *New England Tel. & Tel. Co. v. Clark*, 624 A.2d 298 (R.I. 1993)).

The transaction involved in the instant case conforms even less to the traditional essence-of-the-transaction inquiry. The issue here is not whether the "essence" of the 7-Eleven–franchisee transaction was a taxable sale or a nontaxable service, *see Statistical Tabulating*, 549 S.W.2d at 167; *Austin Multiple Listing Serv.*, 723 S.W.2d at 165, or even whether we can logically "unbundle" the taxable and the nontaxable elements of a single transaction, as in *San Antonio SMSA*. Rather, both the tangible personal property and the services at issue in this appeal are *taxable*.[13] Yet the State attempts to invoke the essence-of-the-transaction doctrine to show that any "[s]oftware that may have been transferred as an integral part of data processing services was merely 'incident to' the 'basic purpose' of this transaction."

As we understand the State's argument, it is that the essence-of-the-transaction test proves that 7-Eleven's motivation for transferring the store software to its franchisees was to obtain a financial benefit for itself, not to transfer the software as an integral part of data-processing services provided to the franchisees. In other words, the State wants to use the test to show that 7-Eleven was

---

[13] We note that the Comptroller has argued in previous administrative hearings that, because the essence-of-the-transaction test was developed prior to the imposition of the sales tax on services, it is not applicable in a case involving taxable services. *See* Comptroller Decision No. 30,394 (Oct. 28, 1997).

not engaged in "a true resale transaction." The State has cited no authority, and we have found none, indicating that the essence-of-the-transaction doctrine has ever been applied in this manner. We conclude that it does not apply here, and that the function of that test has effectively been incorporated into the definition of "sale for resale" regarding whether tangible personal property is "an integral part of a taxable service." *See* Tex. Tax Code Ann. § 151.006(a)(3).[14]

### (3) Other Policy Considerations

The State further argues that allowing the store software purchase to escape sales tax would contravene the purpose of the sale-for-resale exemption, which is to prevent double taxation. In this case, as the State points out, there is no evidence that 7-Eleven charged or collected sales tax for any of the data-processing services it performed for out-of-state franchise stores. Therefore, the State urges that, as a matter of public policy, 7-Eleven should be precluded from claiming the exemption in the absence of evidence that it actually charged sales tax to its franchisees "for the provision of these asserted taxable data processing services."

---

[14] Even if the test were applicable in these circumstances, we disagree with the State's assertion that 7-Eleven's alleged purpose in acquiring the store software from Canmax is material to the inquiry regarding the taxability of the software that 7-Eleven transferred to its franchisees. The essence-of-the-transaction test is intended to determine the essence of what the purchaser received. *See Sharp v. Direct Res. for Print, Inc.*, 910 S.W.2d 535, 538 (Tex. App.—Austin 1995, writ denied) (citing *Statistical Tabulating*, 549 S.W.2d at 169). Thus, in order to determine the essence of the transaction between 7-Eleven and its franchisees, we must consider from the franchisees' perspective whether they received taxable data-processing services. As discussed previously, the evidence establishes that such services enabled the franchisees to use the store software to transmit electronic data to 7-Eleven, where it was processed. The essence-of-the-transaction doctrine, even if applicable, would not support the State's position.

23

7-Eleven responds that the sale-for-resale exemption does not require that the reseller actually collect sales tax on the taxable item, analogizing to resale transactions between contractors and the federal government. *See Day & Zimmerman, Inc. v. Calvert*, 519 S.W.2d 106, 110-11 (Tex. 1975) (holding that contractor who transferred title of items to federal government could claim sale-for-resale exemption even though ultimate resale would not actually be taxed, based on constitutional prohibition against states taxing federal government); *see also Ratheon E-Systems*, 101 S.W.3d at 568, 570 (applying *Day & Zimmerman* analysis to contractor's purchase of tangible overhead materials allocated as indirect costs to contracts with federal government and holding that purchase qualified for sale-for-resale exemption).

We find 7-Eleven's analogy to these cases to be apt. The sale-for-resale statute simply requires that the service to which the transfer of tangible personal property is integral be a *taxable* service—not that it actually *be taxed* in the particular instance in question. *See* Tex. Tax Code Ann. § 151.006(a)(3). While it may be true that 7-Eleven will avoid paying sales tax on some of the software that it purchased for transfer to its stores, this is the result mandated by the plain language of the tax code exemption. The courts have long refused to enforce strained readings of tax-exemption statutes for the purpose of preventing lost revenue to the State. *See, e.g.*, *Schlusselberg v. Calvert*, 443 S.W.2d 695, 697 (Tex. 1969) (holding that such claims "should be addressed to the Legislature, because it is our opinion that the statute as written is too plain to admit any construction other than that adopted by the trial court" and permitting application of sale-for-resale exemption to goods sold out of state, despite Comptroller's contention that such

an interpretation would render it "virtually impossible for him to determine whether the goods are actually resold" and result in "the loss of much revenue"). We likewise decline to do so here.

(4) Partial Conclusion:  The State Was Not Entitled to Summary Judgment With Respect to Franchise Store Software

In view of the foregoing, we hold that the trial court erred in granting the State's motion for summary judgment on the two grounds asserted to defeat 7-Eleven's claims with respect to the sale of Canmax store software to its franchise stores—i.e., that the sale-for-resale exemption does not apply and that the "essence-of-the-transaction" test results in taxability because the Canmax store software was geared toward automating 7-Eleven's retail stores, not data-processing services.[15]

## II.  The State's Entitlement to Summary Judgment:  Out-of-State Company Stores

With respect to the software sent to its out-of-state company stores, 7-Eleven argued that because some of the Canmax store software was purchased to be resold to its out-of-state franchisees, it was entitled to initially put *all* of the software into a "tax-free inventory." Therefore, 7-Eleven reasoned, it could later remove the software that it intended to transfer to its out-of-state

---

[15] In its motion for rehearing, the State for the first time contends that the fact that 7-Eleven performed these data-processing services for its franchisees as a part of an "interrelated bundle" of goods and services in exchange for a lump-sum royalty payment defeats 7-Eleven's sale-for-resale claim, based on the Comptroller's longstanding policy that a royalty payment made under a franchise agreement is not subject to tax. While acknowledging that "[t]he Comptroller failed to state her policy relating to nontaxable royalty payments and their applicability to the undisputed facts," the State nonetheless urges us to "give deference to the Comptroller's policy and conclude that the lump-sum royalty payments made by the franchisees . . . are considered nontaxable payments for an intangible." Because the State did not present this argument to the trial court, however, we are prohibited from affirming the summary judgment on this ground. *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993). We express no opinion on the merits of this argument.

company stores without having to pay Texas sales tax on those items, based on its interpretation of Comptroller rule 3.285.[16]  Rule 3.285 provides:

> When an item is removed from a valid tax-free inventory for use in Texas, Texas sales tax is due. *Texas sales tax is not due on items removed from a valid tax-free inventory for use outside the state.*  When an item purchased under a resale certificate is used for any purpose other than retention, demonstration, or display, the purchaser is liable for sales tax based on the fair market rental value of the item for the period of time used.

34 Tex. Admin. Code § 3.285(e)(1) (2009) (Tex. Comptroller of Pub. Accounts, Resale Certificate; Sale for Resale) (emphasis added).  According to 7-Eleven, the determinative issue with respect to the copies of the store software that were transferred to its company stores is whether the software was "used" in Texas, as "use" is defined in section 151.011 of the tax code.  For software that was installed in its company stores in Texas, 7-Eleven concedes that it owes sales tax.  As to the software that was transferred to its out-of-state company stores, however, 7-Eleven argues that no sales tax is due because there was no use in Texas.

The State sought summary judgment as to the software transferred to 7-Eleven's out-of-state company stores on two grounds:  (1) 7-Eleven cannot prevail on its tax code section

---

[16] The State does not take issue with 7-Eleven's reading of this rule or its applicability to these facts.  The Comptroller's tax-policy division expert, Nancy Prosser, testified that the Comptroller, as a matter of practice, has interpreted the sale-for-resale statute to require that a vendor only intend to sell or transfer at least some of the items that it purchased for its tax-free inventory; it did not necessarily have to know that it would sell or transfer every single item that it put into its tax-free inventory.  *See also, e.g.*, Tex. Comptroller of Pub. Accounts, STAR Document No. 8908L0952E01 (effective Aug. 8, 1989) ("A tax-free inventory of out-of-state purchases may be kept if separate records are maintained on the out-of-state purchases and it is not known whether the items purchased will be used in Texas.").

151.011(f) "claim" because that statute is "definitional and inapplicable to a sales tax transaction";

or, in the alternative, (2) 7-Eleven failed to substantiate its claim that the software was transferred

out of state solely for use outside of Texas. We will address each argument in turn.

(1) Tax Code Section 151.011(f)

In general, "use" refers to "the exercise of a right or power incidental to the ownership

of tangible personal property over tangible personal property." *See* Tex. Tax Code Ann.

§ 151.011(a). Use does not include "the exercise of a right or power over or the keeping or retaining

of tangible personal property for the purpose of transporting the property outside the state for use

solely outside the state." *Id.* § 151.011(f). It is on this exclusion from the definition of use that

7-Eleven relies in asserting that it did not use the store software in Texas when it removed the store

software from its tax-free inventory and transported it to its company stores outside of Texas.

The State's first ground for summary judgment with respect to the software for the

out-of-state company stores asserted that 7-Eleven was not entitled to craft "a sales-tax exemption"

from section 151.001(f), a statute that is "definitional" and "solely applicable to the use tax—not the

sales tax." In the State's view, it is not necessary to determine whether the taxpayer makes a use of

the property in Texas; so long as the taxpayer purchases the property from a Texas seller and takes

possession of the property in Texas, sales tax is due. "Use tax is not applicable if the purchaser paid

sales tax to a Texas retailer or owes sales tax to a Texas retailer who failed to collect it." *See* 34 Tex.

Admin. Code § 3.346(c)(2) (2009) (Tex. Comptroller of Pub. Accounts, Use Tax); *see also* Tex.

Comptroller of Pub. Accounts, STAR Document No. 7712L0100A02 (effective Dec. 1, 1977)

("When a sale is consummated between a Texas seller and his customer and the customer takes

27

possession of the items in Texas, the transaction is subject to sales tax; not use tax [sic].").

According to the State, the Comptroller's understanding that the definition of "use" is immaterial to whether sales tax is due represents a long-standing, uniformly enforced Comptroller policy that should be entitled to deference by this Court. *See Sergeant Enters., Inc. v. Strayhorn*, 112 S.W.3d 241, 250-51 (Tex. App.—Austin 2003, no pet.) ("The consistent construction by an administrative agency charged with effectuating the policy of an enactment carries very considerable weight." (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 543 (1947))).

As noted above, there was no dispute before the trial court concerning whether 7-Eleven was entitled to and in fact did establish a tax-free inventory for the store software that it purchased, some of which it intended to resell to its franchise stores. Accordingly, the only issue before us is whether, upon removing the software intended for its company stores from its tax-free inventory, 7-Eleven owed sales tax on those items. *See* 34 Tex. Admin. Code § 3.285 (providing that when property is removed from tax-free inventory for use in Texas, Texas sales tax is due). In deciding this question, we agree with 7-Eleven that the statutory definition of "use" is material insofar as the plain language of the Comptroller's own rule requires a determination of whether the software was "used" in Texas. *See id.* We therefore hold that summary judgment in favor of the State was improper on the basis that section 151.011(f) of the tax code is immaterial to whether the Canmax software delivered to out-of-state company stores was taxable.

(2) "Divergent Use"

As an "alternative" basis for summary judgment, the State argued that 7-Eleven "ha[d] not presented any evidence to show that the software was transported 'outside the state for use solely outside the state.'" Noting that 7-Eleven is statutorily required to keep records to substantiate each claimed deduction or exclusion, *see* Tex. Tax Code Ann. § 151.025(a)(3), and that the record is devoid of such evidence, the State maintained that it was entitled to judgment as a matter of law. In a related argument, the State claimed that 7-Eleven had made a "divergent use" of the store software by purchasing it tax-free and then using it for a non-exempt purpose.

The "alternative" grounds raised in the State's motion are not proper bases for a rule 166a(c) summary judgment. "When both parties move for summary judgment, each party must carry its own burden *and neither can prevail due to the other's failure to meet its burden*." *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 649 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (citing *W.H.V., Inc. v. Associates Hous. Fin., LLC*, 43 S.W.3d 83, 87-88 (Tex. App.—Dallas 2001, pet. denied)) (emphasis added). Accordingly, even if 7-Eleven failed to establish as a matter of law that it was entitled to a sales-tax exemption for the software that it transferred to its out-of-state company stores by conclusively showing that it did not "use" the software in Texas or make a "divergent use" of the software, that failure did not, ipso facto, entitle the State to summary judgment. *See id.* at 650.

(3) Partial Conclusion:  The State Was Not Entitled to Summary Judgment With Respect to Out-of-State Company Stores

In light of the foregoing, we hold that the trial court erred in granting the State's motion for summary judgment as to 7-Eleven's out-of-state company stores on the grounds asserted.

## III.  7-Eleven's Entitlement to Summary Judgment:  Out-of-State Company Stores

7-Eleven maintains, and we agree, that whether property is removed from a tax-free inventory for "use" outside the state implicates the statutory definition of "use" found in section 151.011(f) of the tax code.  Under that definition, any copies of the store software over which 7-Eleven exercised control solely for the purpose of transport out-of-state were not "used" in Texas.  *See* Tex. Tax Code Ann. § 151.011(f).  Accordingly, to be entitled to summary judgment on this issue, 7-Eleven had to conclusively prove that when it removed the software destined for its out-of-state company stores from its tax-free inventory, it did not exercise a right or power over, keep, or retain the software for any purpose other than to transport it "outside the state for use solely outside the state."  *See id.*  Furthermore, under the plain language of rule 3.285, 7-Eleven was also required to conclusively establish that the software was not used for any purpose other than retention, demonstration, or display.

7-Eleven asserts that it met this burden, having produced uncontroverted evidence that the store software was installed in 1,742 out-of-state company stores in Texas; therefore, it argues, "proof of the number and type of stores and their locations outside the State of Texas proved the number and location of store software copies that were used out-of-state."  7-Eleven further

30

argues that the State failed to produce contraverting evidence showing that any of the store software transported to 7-Eleven's out-of-state company stores was used in Texas.

We disagree with 7-Eleven that the mere fact that the store software was eventually installed in 1,742 out-of-state company stores proves as a matter of law that such software was never used in Texas. The record contains little, if any, evidence regarding what 7-Eleven did with the software during the intervening period of time after it was removed from 7-Eleven's tax-free inventory and before it was installed in the out-of-state company stores. Rule 3.285 suggests that tax liability accrues, at least, for the period of time that items taken from a tax-free inventory are used "for any purpose other than retention, demonstration, or display" while the items are being held for transfer or resale as an integral part of a taxable service.[17] The record contains scant evidence as to what was done with the store software after 7-Eleven took delivery of it and how it was actually transferred to the stores. The attorneys for the parties indicated in their briefs and during oral argument that copies of the store software were made, either by 7-Eleven or at 7-Eleven's direction, in Texas and installed on computers in Texas, and that these computers were then shipped to the out-of-state company stores. According to the Comptroller, "use" occurred at the moment that the software was installed on computers in Texas at 7-Eleven's direction, regardless of whether the computers loaded with the store software were intended to be shipped out of state to be "used" by

---

[17] Although the rule refers specifically to items purchased under a resale certificate and the record here does not conclusively establish that 7-Eleven used a resale certificate for its initial purchase of the software from Canmax, neither party argues that rule 3.285 does not apply to the sale at issue in this case.

31

the out-of-state store operators.  But the present record does not conclusively prove or disprove use in Texas.[18]

We will not speculate as to how 7-Eleven might have used the original gold master of the store software or how it disseminated the store software to its out-of-state company stores in an effort to determine whether such conduct constitutes "use" for purposes of rule 3.285.  To be entitled to summary judgment, 7-Eleven had the burden to prove as a matter of law that it did not use the store software in Texas when it removed the software from its tax-free inventory to be transferred to its out-of-state company stores.  We conclude that the present summary-judgment record does not meet this burden.  Because the summary-judgment record does not conclusively establish that the store software for the out-of-state company stores was used in Texas or that it was *not* used in Texas, we hold that neither party was entitled to summary judgment on this issue.  We overrule 7-Eleven's issue in part as to the store software that was transferred to its out-of-state company stores.

## IV.  *7-Eleven's Entitlement to Summary Judgment:  Franchise Stores*

In its motion for summary judgment, 7-Eleven asserted that, because it had shown that its transfer of store software to its franchisees satisfied the definition of a sale for resale, it

---

[18] In its motion for rehearing, the State argues for the first time that "[t]he record shows that 7-Eleven tested the Golden Masters for general compliance in its own Texas stores prior to any copies being sent to the franchisees," and that the Comptroller has long held that testing software constitutes a taxable use, citing two Comptroller rulings that were not previously cited in its trial court pleadings or appellate briefing.  Although we are not permitted to address this heretofore unasserted ground as a basis for affirming the State's summary judgment, *see Stiles*, 867 S.W.2d at 26, we note that, on remand, such evidence would arguably be relevant in the trial court's determination of whether 7-Eleven's activities constituted "use" of the software in Texas.

proved as a matter of law that its purchase of store software for its franchise stores qualified for the sale-for-resale exemption under section 151.302 of the tax code. 7-Eleven then pointed to its uncontroverted summary-judgment evidence, which established that the fair market value of the Canmax store software that it transferred to its franchise stores was $2,148,928, thereby entitling it to a sales-tax refund of $177,287. 7-Eleven further argued that, with respect to the copies of the software that were sent to 7-Eleven's out-of-state company stores, it conclusively established that the software it removed from its tax-free inventory and shipped to its out-of-state company stores was not "used" in Texas and were therefore exempt from Texas sales tax under Comptroller rule 3.285. As discussed above, rule 3.285 provides that "Texas sales tax is not due on items removed from a valid tax-free inventory for use outside the state." 34 Tex. Admin. Code § 3.285(e)(1). "When an item purchased under a resale certificate is used for any purpose other than retention, demonstration, or display, the purchaser is liable for sales tax based on the fair market rental value of the item for the period of time used." *Id.*

We recognize that, in reviewing cross-motions for summary judgment when the trial court has granted one motion and denied the other, we are to review the summary-judgment evidence presented by both sides and determine all questions presented, rendering the judgment the trial court should have rendered. *See Texas Workers' Comp. Comm'n*, 136 S.W.3d at 648. Accordingly, in our original opinion, we held that 7-Eleven was entitled to judgment as a matter of law as to software sent to its franchisees, having conclusively shown that its purchase of store software for its third-party franchise stores qualified for the sale-for-resale exemption. We now hold, however, in light of the State's motion for rehearing, that the interests of justice would best be served by

33

remanding the cause to the trial court for a fuller development of the potentially dispositive issues that the State has raised.  *See* Tex. R. App. P. 43.3(b).

## IV.  The State's Motion for Rehearing

In its motion for rehearing, the State argues for the first time that the software-development charges for the Canmax store software cannot be allocated in the manner urged by 7-Eleven because the license agreement for the software "provides for a *single* charge for a *single* license," rather than a price per copy.  The State maintains that the Comptroller's "longstanding and consistent policy" has been to treat the purchase of a single computer program license—notwithstanding any right to make copies of the program—as the purchase of a single piece of tangible personal property.  The State further argues that this Court's decision, by accepting 7-Eleven's allocation theory, could give rise "to a constantly reducing tax liability as a taxpayer, over time, continues to make more copies of its single computer program for use out of state."  As a result, the State argues, 7-Eleven's in-state use of *any* of the store software—including that which it admittedly installed and used in its corporate stores in Texas—subjects the entire purchase of store software to sales tax based on 7-Eleven's divergent use.  Thus, a threshold question arises as to precisely *what* 7-Eleven purchased and whether that purchase could properly be allocated between 7-Eleven's franchise and company stores.

To accept the State's position in its motion for rehearing would require us to abandon the analytical framework that has informed this dispute at every stage of the litigation thus far, which posits that the software used in 7-Eleven's franchise stores can and should be treated differently from the software used in its company stores.  At no time before its motion for rehearing has the State

34

argued that what 7-Eleven purchased was a single, indivisible item, the use of which by 7-Eleven's corporate offices and its company stores in Texas subjected the entire purchase to sales tax. Not surprisingly, 7-Eleven responds to the State's motion for rehearing by urging that we cannot consider this argument on appeal, as it represents an entirely new basis for affirming the summary judgment and relies on authorities that the State did not previously cite in its trial court pleadings or appellate briefing.

Like 7-Eleven, we are troubled by the fact that the State has never taken the position during this years-long process that it now asserts on motion for rehearing. Yet we are also cognizant that, by declaring that the State has waived its right to complain of this allocation, this Court's decision could create potentially confusing precedent in an unsettled area of the law based on a record that is largely undeveloped as to these and other important questions now raised by the State. We conclude, therefore, that the interests of justice require us to remand the cause for a determination of these threshold issues raised by the State and, as necessary, any further proceedings to resolve the fact issues regarding 7-Eleven's alleged use of the store software before and after removing it from its tax-free inventory. *See* Tex. R. App. P. 43.3(b); *Mike Norgaard, LPC v. Pingel*, 296 S.W.3d 284, 290 & n.39 (Tex. App.—Fort Worth 2009, no pet.); *Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802, 822 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

## CONCLUSION

We reverse the trial court's summary judgment in favor of the State and remand the cause to the trial court for further proceedings consistent with this opinion.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Henson
    Concurring and Dissenting Opinion by Justice Henson

Reversed and Remanded on Motion for Rehearing

Filed:   April 22, 2010